[Civ. No. 48770. Second Dist., Div. Five. Sept. 27, 1978.]

CITY OF LOS ANGELES et al., Petitioners, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY,
Respondent;
LOUIS F. LEVY, Real Party in Interest.

[Civ. No. 50055. Second Dist., Div. Five. Sept. 27, 1978.]

LOUIS F. LEVY, Plaintiff and Appellant, v.
COUNTY OF LOS ANGELES et al., Defendants and Respondents.

---

---

**COUNSEL**

Aaron L. Lincoff for Real Party in Interest and for Plaintiff and Appellant.

Burt Pines, City Attorney, John T. Neville, Assistant City Attorney, and Arthur D. Rutledge, Deputy City Attorney, for Petitioners.

No appearance for Respondent.

John H. Larson, County Counsel, and Frederick R. Bennett, Deputy County Counsel, for Defendants and Respondents.

## OPINION

KAUS, P. J.—Plaintiff, appellant and real party in interest, Louis F. Levy, filed an action against the City and County of Los Angeles and certain of their employees, seeking damages for the seizure, withholding and loss of personal property. All defendants moved for summary judgment, urging that the action was barred by earlier proceedings, state and federal. The motion filed on behalf of the county and its employees was granted and Levy's appeal from the ensuing judgment is one of the matters before us. The motion of the city and its employees was denied. This ruling was protested by them in a petition for a writ of mandate. We issued an alternative writ and the question whether a peremptory writ should be granted is the other matter dealt with in this opinion.

### FACTS

#### *The Present (Second State) Action—Levy III*

The complaint names as defendants the City of Los Angeles and Frank Gravante, a sergeant in the Los Angeles Police Department, the County of Los Angeles and a pride of county officials, such as its tax collector, tax assessor, county counsel, and some of their deputies, and alleges:

Levy's problems with the various defendants started on August 19, 1970, when Gravante made the first of three illegal arrests of Levy; the two others followed on August 25 and September 1, 1970. On each occasion Gravante seized personal property "consisting generally of jewelry, precious medals, items of a personal coin collection and other personal effects." The properties so seized remained in possession of the City of Los Angeles until July 31, 1973, when they were returned to Levy; however, certain "key coins" worth $25,000 were missing. Levy's loss of use on the property that was returned by the city was $14,875.[1]

On September 3, 1970, Gravante informed certain county officials that Levy had more, similar personal property at his Beverly Hills home, that the property had been obtained by Levy "by improper and unlawful

---

[1]Although generally the complaint is so drafted that the city and county are alleged to be responsible for all of plaintiff's losses, plaintiff concedes that the county is only responsible for $3,602.06 with respect to the loss of use of the property seized by Gravante. The county's responsibility for the loss of use of that property is alleged to have started on November 24, 1972, when the county, having learned of the property in possession of the Los Angeles Police Department, subjected it to a "hold" and "Notice of Seizure and Sale."

means" and that it was "being secreted and concealed" by Levy for the purpose of "evading the payment of unsecured personal property taxes . . ." This information was knowingly false. Nevertheless, on September 14, 1970, certain county officials caused more of Levy's personal property to be seized and taken away from his home "and to be the subject of escape assessments for alleged unpaid unsecured personal property taxes for the fiscal years 1965 through 1970, . . ."[2]

On November 4, 1970, Levy filed an action (Levy I) in which he sought an injunction enjoining the county from selling the personal property seized by it for nonpayment of unsecured property taxes and a declaration that the personal property involved was exempt from taxation. In May 1973, the superior court rendered judgment against the county, ordering that all personal property seized from Levy be returned. On August 1 and 2, the county purported to return all of the property that it had seized, but failed to return certain items worth $250,000. In addition Levy suffered a loss of use of $81,667 on the property the county did return.[3]

The complaint also pleads that the various arrests, seizures and proceedings described humiliated and embarrassed Levy and caused him to suffer severe emotional and mental distress. He therefore seeks punitive and exemplary damages against all individual defendants in the sum of $100,000. Nowhere, however, does he demand compensatory damages for these personal slights and mortifications.[4]

---

[2]The complaint also alleges that all criminal charges filed against Levy in connection with the three arrests were eventually dismissed for insufficiency of the evidence or lack of prosecution.

[3]In sum, excluding attorneys fees and punitive damages, plaintiff's complaint seeks compensation for the following items:

| | |
|---|---|
| 1. Value of personal property not returned by county on August 1 and 2, 1973 | $250,000 |
| 2. Loss of use of property seized by county and returned | 81,667 |
| 3. Loss of use of property seized by the city and returned | 14,875 |
| 4. Value of "key coins" seized by the city but not returned | 25,000 |
| | $371,542 |

[4]The complaint was filed on March 8, 1974. In various memoranda filed in the trial court, plaintiff stresses that the action is governed by the three-year statute of limitations for "an action for taking, detaining, or injuring any goods, or chattels, . . ." Apparently he appreciates that at least the lion's share of any damages for humiliation, embarrassment and so forth would be barred by the one-year limitation of subdivision 3 of section 340 of the Code of Civil Procedure. We express no view whether such damages, though not

*The Federal Civil Rights Action—Levy II*

This action, brought under the Civil Rights Act (42 U.S.C. § 1983) was filed on August 17, 1973. Suitably decorated as a civil rights complaint,[5] it pleads, in the main, the facts later alleged in Levy III.[6] Neither the city nor the county, the two public agencies before us, was named as a defendant. Under the law as it was thought to be at the time (*Moor* v. *County of Alameda* (1973) 411 U.S. 693, 715 [36 L.Ed.2d 596, 612-613, 93 S.Ct. 1785]; *Monroe* v. *Pape* (1961) 365 U.S. 167, 187-192 [5 L.Ed.2d 492, 505-508, 81 S.Ct. 473]) any attempt to name either entity would have been quixotic.[7]

After a long trial Levy II went to a jury. Verdicts in favor of all defendants were returned and the judgments entered thereon became final.

*The First State Action—Levy I*

While both the county's and the city's motions for summary judgment rely on Levy II, the county has another string to its bow: the 1970 state action, referred to in the present complaint, which resulted in total triumph for Levy. In brief, on May 31, 1973, there was entered a judgment against the county in which it was (1) permanently enjoined from "selling, transferring, conveying or in any other manner disposing of" plaintiff's personal property; (2) ordered and directed to return plaintiff's property to him; and (3) ordered to release the "hold" on

---

recoverable as such, may nevertheless serve as the trigger for the recovery of punitive damages in actions governed by subdivision 3 of section 338.

[5]Typically, this was achieved by alleging that acts alleged in Levy III to be merely unjustified, were done "under color of law."

[6]The only item of damage not sought in Levy II but demanded in Levy III is the $25,000 item for lost "key coins" seized but not returned by Sergeant Gravante.

[7]Until the United States Supreme Court decided *Monell* v. *New York City Dept. of Social Services* (1978) 436 U.S. 658 [56 L.Ed.2d 611, 98 S.Ct. 2018], on June 6, 1978, it was accepted dogma that public entities were not "persons" within the meaning of 42 United States Code section 1983. (*Monroe* v. *Pape* (1961) *supra*, 365 U.S. 167, 187-192 [5 L.Ed.2d 492, 505-508].) *Monell* changed all that, at least where the action that is alleged to be unconstitutional "implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." (436 U.S. at p. 690 [56 L.Ed.2d at p. 635].) Nevertheless, *Monell* decided little except that the absolute immunity granted to municipalities by *Monroe* v. *Pape, supra,* was no longer good law. In particular, *Monell* did not make entities vicariously liable for the constitutional transgressions of their employees. (436 U.S. at p. 701, fn. 66 [56 L.Ed.2d at p. 642].) The only liability which Levy has ever asserted against either the city or the county is, however, based solely on respondeat superior.

plaintiff's property that was physically in possession of the Los Angeles Police Department. In the judgment the court further ordered that it would retain jurisdiction over the "issue of compliance or noncompliance" with the key provisions of the judgment and any such "matter and issue may be reset for hearing on the merits before this Court, on motion of the Court of either of the parties hereto, and upon due notice of the time and place thereof being given to the other party."

Although, as noted, Levy contends that the county failed to return $250,000 worth of property, no proceedings with respect thereto were commenced in the first state action.

Additional facts will be related where appropriate.

## DISCUSSION

### I

Both the city and county urge that Levy is estopped from pursuing the present action against either of them or their employees because the "conversion action was actually litigated and determined adversely to [Levy]" by the jury in Levy II, the federal civil rights action.

The plain fact is that we have no way of telling just what the jury in that action determined. Conversion is a species of strict liability in which questions of good faith, lack of knowledge and motive are ordinarily immaterial. (*Henderson* v. *Security Nat. Bank* (1977) 72 Cal.App.3d 764, 770-771 [140 Cal.Rptr. 388].) Yet the federal civil rights jury was instructed that a prerequisite to a verdict for plaintiff was a finding that the "defendant knew or reasonably should have known that the action he took would violate the constitutional rights of the plaintiff, or that he took the action with malicious intention to cause a deprivation of constitutional rights or other injury to the plaintiff."[8] Thus, the general

---

[8]Additional instructions foreign to most conversion actions read as follows:

"If you should find, from a preponderance of the evidence, that the defendants acted beyond the bounds of their lawful authority under state law, at the time and place alleged, then you may further find that the defendants did, 'without due process of law,' deprive the plaintiff of rights secured to him and protected by the Constitution and laws of the United States. And if you so find, then you must proceed to determine the amount of the actual or compensatory damages suffered or sustained by the plaintiff, as a proximate result of the defendants' conduct.

". . . . . . . . . . . . . . .

"Acts are done 'under color of law' of a state, not only when State Officials act within the bounds or limits of their lawful authority, but also when such officers act without and beyond the bounds of their lawful authority. In order for unlawful acts of an official to be

verdict in the civil rights action could have been based solely on a finding that plaintiff had not proved the requisite knowledge or intent to violate his civil rights, a finding wholly independent of the issue of conversion. Since we cannot determine from the face of the record in the federal action that the question of conversion was necessarily decided by the jury, the verdict in that case does not bar the present action by way of collateral estoppel. (See *Horton* v. *Goodenough* (1920) 184 Cal. 451, 460 [194 P. 34]; *Davies* v. *Krasna* (1970) 12 Cal.App.3d 1049, 1054 [91 Cal.Rptr. 250].)

## II

■ More complex but determinative of the proceedings before us is the claim that Levy III is barred by Levy II because by pursuing Levy III, Levy is attempting to split a single cause of action and make it the basis of several suits—a practice prohibited whether the first suit is still pending (e.g., *Wulffjen* v. *Dolton* (1944) 24 Cal.2d 891, 894-895 [151 P.2d 840]) or has been disposed of. (E.g., *Slater* v. *Blackwood* (1975) 15 Cal.3d 791, 795 [126 Cal.Rptr. 225, 543 P.2d 593]; see generally 3 Witkin, Cal. Procedure (2d ed. 1971) Pleading, § 32, pp. 1715-1717.)[9]

Before we reach the question whether the conversion counts pursued in Levy III form part of the cause of action submitted to the court in Levy II, we should discuss whether it matters that Levy II was a federal action, based on a federal statute, brought in a federal court.

There are at least three separate reasons for ignoring the state-federal distinction. First: if the facts alleged in Levy II and Levy III derived "from a common nucleus of operative fact . . . ." (*Mine Workers* v. *Gibbs* (1966) 383 U.S. 715, 725 [16 L.Ed.2d 218, 228, 86 S.Ct. 1130]), the conversion counts could have been tried in the United States District

done 'under color of any law,' however, the unlawful acts must be done while the official is purporting or pretending to act in the performance of his official duties, that is to say, the unlawful acts must consist in an abuse or misuse of a power which is possessed by the official only because he is an official; and the unlawful acts must be of such a nature, and be committed under such circumstances, that they would not have occurred but for the fact that the person committing them was an official, purporting to exercise his official powers."

[9]Since neither the city nor the county were defendants in Levy II, we shall first examine this claim from the point of view of the individual defendants. Later we shall see how whatever result we reach affects the two public entities.

Court under that court's "pendent jurisdiction." The "common nucleus" requirement is obviously satisfied here.[10] Second: no one compelled Levy to file his civil rights action in the federal court. He could have sued in the state court (*Williams* v. *Horvath* (1976) 16 Cal.3d 834, 837 [129 Cal.Rptr. 453, 548 P.2d 1125]), where his power to join the conversion counts with his civil rights grievances would have been unquestioned. (Code Civ. Proc., § 427.10.) ■ Third: it appears to be the law that a litigant cannot avoid the impact of the rule against splitting causes of action by choosing for his first foray a tribunal of limited jurisdiction. (Rest., Judgments, § 62, com. j; cf., *Zirker* v. *Hughes* (1888) 77 Cal. 235 [19 P. 423].)

In any event, it is clear that the rule against splitting a cause of action and the fatal consequences for violating it are the same—other things being equal—even if one aspect of the cause of action twice pursued is based on a federal, statutory right. *Ford Motor Co.* v. *Superior Court* (1973) 35 Cal.App.3d 676, 679-680 [110 Cal.Rptr. 59] is precisely in point.[11] (See generally 3 Witkin, Cal. Procedure (2d ed. 1971) § 32, pp. 1715-1716.)

---

[10]To avoid any misunderstanding: we are fully aware that practically a mirror image of pre-*Monell* (see fn. 7, *ante*) law was the rule that public entities could not be joined as defendants in section 1983 actions, even under the federal court's pendent jurisdiction. (See *Aldinger* v. *Howard* (1976) 427 U.S. 1 [49 L.Ed.2d 276, 96 S.Ct. 2413].) We would not presume to anticipate the extent to which *Monell* may affect *Aldinger*. Suffice it to say that nothing in this opinion rests on any premise that the city or county should have been joined in Levy II under the district court's pendent jurisdiction.

[11]So is comment e. to section 61.1 of the Restatement Second of Judgments, Tentative Draft No. 5.

"e. *State and federal theories or grounds.* A given claim may find support in theories or grounds arising from both state and federal law. When the plaintiff brings an action on the claim in a court, either state or federal, in which there is no jurisdictional obstacle to his advancing both theories or grounds, but he presents only one of them, and judgment is entered with respect to it, he may not maintain a second action in which he tenders the other theory or ground."

Illustration 10 to section 61.1 is as follows:

"10. A commences an action against B in a federal court for treble damages under the federal antitrust laws. After trial, judgment is entered for the defendant. A then seeks to commence an action for damages against B in a state court under the state antitrust law grounded upon substantially the same business dealings as had been alleged in the federal action. Even if diversity of citizenship between the parties did not exist, the federal court would have had 'pendent' jurisdiction to entertain the state theory. Therefore unless it is clear that the federal court would have declined as a matter of discretion to exercise that jurisdiction (for example, because the federal claim, though substantial, was dismissed in advance of trial), the state action is barred." Cases relied on include *Woods Exploration & Pro. Co.* v. *Aluminum Co. of Amer.* (5th Cir. 1971) 438 F.2d 1286, 1311-1316; *McCann* v. *Whitncy* (Sup.Ct. 1941) 25 N.Y.S.2d 354.)

Further by way of background, it is well to remind ourselves that a plaintiff may well be splitting a cause of action, although the second time around he is asking for different relief or proceeding on a different legal theory. (*Panos* v. *Great Western Packing Co.* (1943) 21 Cal.2d 636, 638-639 [134 P.2d 242]; *Frost* v. *Witter* (1901) 132 Cal. 421, 426 [64 P. 705].) *Slater* v. *Blackwood, supra,* 16 Cal.3d 791, was a rather extreme application of this principle. In 1970 the plaintiff, a minor, had filed an action under California's then existing guest statute. Apparently unable to prove intoxication or willful misconduct, he was nonsuited and the judgment against him eventually became final. Soon thereafter, in *Brown* v. *Merlo* (1973) 8 Cal.3d 855 [106 Cal.Rptr. 388, 506 P.2d 212, 66 A.L.R.3d 505], the guest statute was held unconstitutional. Thus encouraged the plaintiff, still a minor, filed a new complaint based on the same accident but claiming simple negligence. The trial court dismissed the action on the ground that the earlier judgment was a bar to the second suit. The Supreme Court agreed: the new complaint did not state a new cause of action but merely presented a different theory seeking to vindicate the same "primary right" of the plaintiff. The negligence theory was merely a new "count" stating the same cause of action under the belated sponsorship of *Brown* v. *Merlo.* (See *Eichler Homes of San Mateo, Inc.* v. *Superior Court* (1961) 55 Cal.2d 845, 847 [13 Cal.Rptr. 194, 361 P.2d 914].) Slater, therefore, had managed to commit the sin of splitting a cause of action although not only the Legislature, but even—until *Brown* v. *Merlo* came along—the courts, had assured him that there was nothing to split.

■ This brings us to our penultimate problem: is Levy III an attempt to split a cause of action decided in Levy II? *Slater,* as noted, in a rather hard case, strongly reaffirmed that in California Professor Pomeroy's "Primary Rights" concept of what constitutes a cause of action has, in the words of one academic troika, "achieved a well-nigh impregnable position of authority." (1 Chadbourn et al., Cal. Pleading, § 761, p. 655; see also 3 Witkin, Cal Procedure (2d ed. 1971) Pleading, § 22 and cases cited therein.)[12]

---

[12]As quoted by Witkin, Pomeroy's primary right theory is formulated as follows: " 'Every judicial action must therefore involve the following elements: a *primary right* possessed by the plaintiff, and a corresponding *primary duty* devolving upon the defendant; a *delict or wrong* done by the defendant which consisted in a breach of such primary right and duty; a *remedial right* in favor of the plaintiff, and a remedial duty resting on the defendant springing from this delict, and finally the *remedy or relief* itself. . . . Of these elements, the *primary right and duty and the delict or wrong combined constitute the cause of action* . . . the existence of a legal right in an abstract form is never alleged by the plaintiff; but, instead thereof, the facts from which that right arises are set forth, and the right itself is inferred therefrom. The cause of action, as it appears in the complaint

While it must be acknowledged that the primary rights theory does not automatically solve all problems since "[t]he concept of 'cause of action' may thus be enlarged or narrowed in proportion to the breadth of the particular court's concept of 'primary right' " (Chadbourn, et al., *op. cit.,* p. 657), at the very least it furnishes us with a verbal framework within which to decide this case.

Was Levy II an attempt to vindicate the same primary right or rights involved in Levy III? We think that it was, pragmatically as well as conceptually.

Pragmatically it would be difficult to distinguish the rights asserted in Levy III from those sought to be vindicated in Levy II. Reviewing, for example, a document entitled "Memorandum of Contentions of Fact and Law" filed by Levy in the United States District Court on December 2, 1974, we find its substance to be a paraphrase of the complaint in Levy III. Or if we look at the instructions on damages which the trial court gave the federal jury,[13] we see that it was given pretty much the standard type of damage instructions a state jury would have received in a conversion action. (Civ. Code, § 3336; *Sherman* v. *Finch* (1886) 71 Cal. 68, 71-72 [11 P. 847]; *Kane* v. *County of San Diego* (1969) 2 Cal.App.3d 550, 553 [83 Cal.Rptr. 19].) In other words, its constitutional overtones aside, the civil rights action was designed to vindicate precisely the same interests in Levy's personal property that he seeks to vindicate in the matter before us.

when properly pleaded, will therefore always be the *facts* from which the plaintiff's primary right and the defendant's corresponding primary duty have arisen, together with the *facts* which constitute the defendant's delict or act of wrong.' (Pomeroy, Code Remedies (5th ed.), p. 528; ...."

[13]"If, under the Court's instruction, you find the plaintiff is entitled to a verdict against one or more of the defendants for deprivation of his property without due process of law, you may award damages as follows:

"1. For property wrongfully seized and returned to the plaintiff, interest at 7 percent on the reasonable market value of the property at the time and place of conversion.

"2. For property wrongfully seized and not returned to the plaintiff, the reasonable market value of the property at the time and place of conversion, together with interest from that time at 7 percent.

"Or in lieu of the above measures of damages, you may award an amount sufficient to indemnify the plaintiff for the loss which is the natural, reasonable and proximate result of the wrongful seizure and the detention of his property.

"In addition to any of the above measures of damage, you may award fair compensation for the time and money properly expended in pursuit of the property. Such an award cannot include reimbursement for attorneys fees expended in pursuit of the property."

Nor have we any conceptual difficulties holding that the civil rights action and the second state action involve the same primary right. *Carey v. Piphus* (1978) 435 U.S. 247 [55 L.Ed.2d 252, 98 S.Ct. 1042], involved high school students who had been disciplined without procedural due process. The question before the Supreme Court was whether they were entitled to more than nominal damages, if the discipline imposed was, in fact, justified. The court held "that in the absence of proof of actual injury, the students are entitled to recover only nominal damages." (435 U.S. at p. 248 [55 L.Ed.2d at p. 255].) In reaching this result the Supreme Court disapproved the students' arguments to the effect that they were entitled to substantial damages merely because they had been deprived of constitutional rights, whether or not any injury was caused by such deprivation. Such rights, said the court ". . . do not exist in a vacuum. Their purpose is to protect persons from injuries to particular interests, *and their contours are shaped by the interests they protect.*" (435 U.S. at p. 254 [55 L.Ed.2d at p. 259]; our italics.) The contours of Levy's civil rights action were therefore shaped by his interests in the personal property converted and withheld by the city and county employees—precisely the same rights which the second state action is all about.

## III

We therefore hold that the demurrer was properly sustained as far as the county employees are concerned and that it should have been sustained as to Sergeant Gravante. What, however, of their employers—the county and the city? Levy makes no claim that they are liable other than vicariously. ■ The applicable rule is therefore clear: a judgment in favor of a defendant for whom another party is vicariously liable is res judicata as to that other party if the judgment was based on the merits. (*Bernhard* v. *Bank of America* (1942) 19 Cal.2d 807, 812-813 [122 P.2d 892]; Rest., Judgments, § 99.)[14]

---

[14]The tentative draft of section 99 of the Restatement Second of Judgments (Tent. Draft No. 4) reads in relevant part as follows: "§ 99. Persons Having a Relationship in Which One Is Vicariously Responsible for the Conduct of the Other.

"If two persons have a relationship such that one of them is vicariously responsible for the conduct of the other, and an action is brought by the injured person against one of them, the judgment in the action has the following preclusive effects against the injured person in a subsequent action against the other.

"(1) A judgment against the injured person that bars him from reasserting his claim against the defendant in the first action extinguishes any claim he has against the other person responsible for the conduct unless:

"(a) The claim asserted in the second action is based upon grounds *that could not have been asserted* against the defendant in the first action; or

"(b) The judgment in the first action was based on a defense that was personal to the defendant in the first action." (Our italics.)

Levy II was obviously decided on the merits: Levy was not told that he was in the wrong court either because of lack of jurisdiction or venue; no one questioned his capacity to sue or the defendants' to be sued; there were no complaints about nonjoinder or misjoinder of parties or claims; and no one raised an issue concerning the statute of limitation. The case went to a jury which decided the merits of the civil rights action that was submitted to it.

The fact that the rule against splitting a cause of action prohibits Levy from asking another jury to look at the merits from a slightly different angle does not change the nature of the adjudication in Levy II; it is, rather, an attribute of such an adjudication which, having been on the merits, redounds to the benefit of the two employers.

IV

■ Finally, as far as the county is concerned, it seems quite obvious that Levy is twice out of court because he failed to join his claim for damages with his request for equitable relief in Levy I. (*Van Horne* v. *Treadwell* (1913) 164 Cal. 620, 622-623 [130 P. 5]; *Hatch* v. *Bank of America* (1960) 182 Cal.App.2d 206, 208-210 [5 Cal.Rptr. 875]; *McCaffrey* v. *Wiley* (1951) 103 Cal.App.2d 621, 626 [230 P.2d 152].)

There is nothing to Levy's argument that a ruling of the federal court in Levy II denying the county defendants' motion for summary judgment on that very ground estops the county and its employees with respect to a similar motion filed by it in the present case. Right or wrong the interlocutory ruling of the federal court was not a final judgment and any error became academic when the county defendants prevailed on the merits.

The judgment is affirmed. The petition for a peremptory writ of mandate is granted.

Ashby, J., and Hastings, J., concurred.