[Civ. No. 56674. Second Dist., Div. Five. Mar. 17, 1981.]

ALLSTATE SAVINGS AND LOAN ASSOCIATION,
Cross-complainant and Respondent, v.
JOHN LOTITO, Cross-defendant and Appellant.

**COUNSEL**

Arnold M. Notkoff for Cross-defendant and Appellant.

Breidenbach, Swainston, Yokaitis & Crispo, William R. Larr and Richard F. Lunetta for Cross-complainant and Respondent.

**OPINION**

**KAUS, P. J.**—By a grant deed dated October 23, 1968, Anna D. Peyton purportedly transferred her residence located at 2894 East Sierra Madre Boulevard, in Pasadena, to her only son, James W. Peyton. In February 1974, Elvin Wayment as the conservator of Mrs. Peyton's estate, brought suit against James and numerous other parties including respondent Allstate Savings and Loan Association and appellant John Lotito, the notary public who acknowledged the signature of Anna D. Peyton on the 1968 deed. By his first cause of action, the conservator

sought to quiet title to the Sierra Madre Boulevard property against James and Allstate, claiming that the 1968 grant deed was a forgery.

After James got the apparent title to the property by virtue of the alleged forged deed, he had borrowed $24,000 from Allstate giving it a trust deed on the property as security.[1] Allstate cross-complained for indemnity against James and appellant Lotito. It was Allstate's position that if the 1968 deed proved to be a forgery, Allstate would lose its position as a secured creditor and its chance to secure repayment of its loan to James. Allstate claimed indemnity in the amount of $24,000 from James on the theory that he was responsible for the forgery and from Lotito on the theory that he breached his official duty in failing to ascertain the identity of the person who signed the deed as Anna D. Peyton.[2]

The conservator, through negotiation, arranged to have the Sierra Madre Boulevard property deeded back to the conservatorship estate. He then sought and received a summary judgment against James on his first cause of action to quiet title to the property. The conservator either settled with all the remaining parties or abandoned further proceedings against them.

While there are numerous cross-complaints by many of the original defendants, all of the cross-complaints were dismissed except Allstate's cross-complaint against James and Lotito.

Before trial Allstate made motions for summary adjudication with respect to specified issues which Allstate claimed to be without substantial controversy. One such motion was granted as to the issue whether the signature of Anna B. Peyton upon the 1968 deed was a forgery.

Allstate's cross-complaint then proceeded to a jury trial and at its conclusion the trial court directed a verdict in favor of Allstate concluding, among other things, that Lotito had been negligent in notarizing the 1968 deed. Judgment in the sum of $25,138.72 was entered against

---

[1]Other defendants were also holders of security interests against the property, but the conservator settled his claims against those defendants and they are not important to this appeal.

[2]Allstate also sued Fidelity and Deposit Company of Maryland as the surety on Lotito's notary's bond.

Lotito, James, and Fidelity and Deposit Company of Maryland, the bonding company.

Lotito appeals from the judgment, asserting that the trial court erred in adjudicating that there was no substantial controversy that the 1968 deed was a forgery and in directing the jury that he had been negligent.

### SUMMARY ADJUDICATION OF THE FORGERY ISSUE

In granting Allstate's motion for summary adjudication of the issue respecting the alleged forgery of the 1968 deed, the trial court relied on the fact that a summary judgment had been granted in favor of the conservator quieting title against James, Mrs. Peyton's son.

The basis for the conservator's motion for summary judgment on his quiet title cause of action against James was a third-party transfer of title to the Sierra Madre Boulevard property back to the conservator. The moving papers established that the conservator had entered into a settlement with all the defendants named in the first cause of action except James and that pursuant to the settlement all security instruments against the property "were in the process of being reconveyed to the plaintiff." A title search showed that on January 24, 1973 James had transferred the property to one Robert D. Evans. Counsel for the conservator had then contacted Evans and explained to him the nature of the lawsuit concerning the property. Evans agreed to convey his right, title and interest in the property to the conservator in return for the conservator's agreement to release Evans from any liability and not to proceed against Evans. Evans then executed a quit claim deed in favor of the conservatorship estate on October 25, 1976.

Since the conservator had acquired title to the property and all outstanding security interests against the property were being reconveyed to him, the trial court granted summary judgment on the quiet title action. Although in connection with the motion for summary judgment no attempt had been made to prove that the 1968 deed, notarized by Lotito, was a forgery, the judgment entered pursuant to the order granting the motion therefor, contained a declaration that the deed was "void." No reason for such voidness was specified.

When, over a year later, Allstate moved for a summary adjudication that there was no substantial controversy that the 1968 deed was a forgery, the basis for the motion was that the earlier declaration that

the deed was a forgery collaterally estopped Lotito from asserting the contrary.

■ The argument that Lotito is collaterally estopped by the court's declaration that the 1968 deed was void, has no merit. Leaving aside that "void" does not necessarily mean "forged," it is abundantly clear that the issue of the validity of the deed was immaterial to the theory on which the summary judgment was obtained—namely, that the conservatee had received whatever title her son had from his grantee Evans. Thus the question of forgery was not put in issue and the declaration that the 1968 deed was "void" obviously was not essential to the judgment. At best, it was an alternative theory on which the judgment was based. (*City of Los Angeles* v. *Superior Court* (1978) 85 Cal. App.3d 143, 150 [149 Cal.Rptr. 320]; Rest., Judgments, § 68. See *Albertson* v..*Raboff* (1956) 46 Cal.2d 375, 385 [295 P.2d 405]; *People* ex rel. *Baker* v. *Mack* (1971) 19 Cal.App.3d 1040, 1049 [97 Cal.Rptr. 448].) The fact that Lotito did not appeal from the judgment is immaterial. Not being affected by it, he had no reason to.[3]

## THE NOTARY'S NEGLIGENCE

Civil Code section 1185 has governed the duties of a notary public in taking the acknowledgment of an instrument since 1872. That section provides—and always had provided—that the notary must either personally know the individual who executed the document or must know a witness who will swear to the identity of the person who executed the documents.[4] (See *Anderson* v. *Aronsohn* (1919) 181 Cal. 294 [184 P. 12]; *Joost* v. *Craig* (1901) 131 Cal. 504 [63 P. 840]; *Hatton* v. *Holmes* (1893) 97 Cal. 208 [31 P. 1131]; *Transamerica Title Ins. Co.* v. *Green* (1970) 11 Cal.App.3d 693 [89 Cal.Rptr. 915, 44 A.L.R.3d 543]; *Homan* v. *Wayer* (1908) 9 Cal.App. 123 [98 P. 80].)

---

[3]Respondent did not always feel that the summary judgment quieting title against James Peyton resolved the forgery issue. In an earlier motion for summary adjudication with respect to certain affirmative defenses, it stated: "Even though the issue of forgery apparently must therefore be tried,..."

[4]Civil Code section 1185 provides in pertinent part, "The acknowledgment of an instrument must not be taken unless the officer taking it knows or has satisfactory evidence, on the oath or affirmation of a credible witness, that the person making such acknowledgment is the individual who is described in, and who executed the instrument;..."

Here, Lotito testified that before October 23, 1968, the date on which the deed was signed, he had never met Anna Peyton or any of her acquaintances. He did not actually remember the occasion in 1968 when he notarized the deed, but at that time it was his custom and practice to require a form of identification such as a passport, an immigration card or a driver's license before he notarized an individual's signature.

■ Based on this evidence the trial court did not err in directing a finding against Lotito on the issue of negligence. Since Lotito did not purport to rely on the "oath or affirmation of a reliable witness" in notarizing the signature of Anna Peyton, the statute and case law required that he personally know Anna Peyton before he notarized her signature. Reliance on paper identification is not sufficient compliance with Civil Code section 1185.

The notary in *Anderson* v. *Aronsohn, supra*, 181 Cal. 294, took the acknowledgment of three different individuals. As to the first two, the notary relied upon an introduction under oath by a third person personally known to him, made in connection with another transaction. Thereafter the notary met them five or six times on social and business occasions before certifying that they were known to him. As to the second individual, the notary was introduced to her by his former teacher. He met her on another occasion before acknowledging her signature. The court held that under these circumstances the notary did not have the requisite degree of acquaintance with the three individuals to certify that he possessed "personal knowledge" of them. The court stated the test of such knowledge as follows: "Such knowledge . . . involves such an acquaintance, derived from association with the individuals in relation to other people, as establishes their identity with at least reasonable certainty. Such an acquaintance cannot in its very nature depend upon the mere word of one or two or three individuals, but must be based upon a chain of circumstances surrounding the person in question, all of which tend to show that they are what they purport to be. That there is nothing to arouse suspicion is not enough." (181 Cal. at p. 297.)

*Anderson* has not been treated as an anachronism. In *Transamerica Title Ins. Co.* v. *Green* (1970) 11 Cal.App.3d 693 [89 Cal.Rptr. 915, 44 A.L.R.3d 543] the notary was found to be negligent as a matter of law when he certified to the identity of two signatories after they had been introduced to him by his law partner. The case, incidentally, also held (*id.*, pp. 702-703) that the trial court erred in admitting evidence that

notaries in the county in question customarily did not comply with section 1185.

We agree that the *Anderson* rule is harsh and somewhat unrealistic in today's mobile society. One of its purposes is obviously to ensure the stability of titles by eliminating, insofar as possible, forged deeds, mortgages, deeds of trust and other conveyances. The section has been on the books for over a century and the *Anderson* interpretation has not been questioned for over 60 years. If there is to be any change in the law, it must come from Sacramento or San Francisco.

■ Lotito refers us to section 8230 of the Government Code[5] enacted in 1977 as proof that, as of that year at least, the Legislature had the requisite change of heart. He is misled. Section 8230 refers to a jurat—which is simply a certificate evidencing the fact that an affidavit was properly made before a duly authorized officer. Such jurats are executed by notaries pursuant to their power under Government Code section 8205, subdivision (a)(3). Unlike acknowledgments—which notaries are empowered to take under Government Code section 8205, subdivision (a)(2)—jurats are generally not competent to prove the identity of the affiant. (Evid. Code, § 1451; cf., *Conn, Sherrod & Co.* v. *Tri-Elec. Supply Co.* (Tex.Civ.App. 1976) 535 S.W.2d 31, 35; but see *People* v. *McLeod* (1916) 30 Cal.App. 435, 437-438 [158 P. 506] [dictum].) Section 8230 merely provides that if a jurat is contained in a document which purports to identify the affiant in and with respect to certain particulars, the notary must require certain identification as a condition to executing the jurat. In no way can section 8230 be read as a legislative amelioration of section 1185 of the Civil Code which relates to acknowledgments.

---

[5]Government Code section 8230 reads as follows: "If a notary public executes a jurat and the statement sworn or subscribed to is contained in a document purporting to identify the affiant, and includes the birthdate or age of the person and a purported photograph or finger or thumbprint of the person so swearing or subscribing, the notary public shall require, as a condition to executing the jurat, that the person verify the birthdate or age contained in the statement by showing either:

"(a) A certified copy of the person's birth certificate or

"(b) An identification card or driver's license issued by the Department of Motor Vehicles.

"For the purposes of preparing for submission of forms required by the United States Immigration and Naturalization Service, and only for such purposes, a notary public may also accept for identification any documents or declarations acceptable to the United States Immigration and Naturalization Service."

Since the only error found by us is the summary determination of the issue of forgery, the retrial shall be confined to that issue.

Reversed.

Ashby, J., and Hastings, J., concurred.

A petition for a rehearing was denied April 2, 1981, and the opinion was modified to read as printed above.