[Civ. No. 43048. Second Dist., Div. One. Oct. 16, 1974.]

ROBERT SHERMAN et al., Plaintiffs and Appellants, v.
MERTZ ENTERPRISES et al., Defendants and Respondents.

## COUNSEL

Anton Dumhart for Plaintiffs and Appellants.

Ruffo, Ferrari & McNeil, Thomas P. O'Donnell, Frank Heller and Richard S. Weiner for Defendants and Respondents.

## OPINION

**HANSON, J.—**

### THE CASE

Plaintiff Robert Sherman, doing business as Howard's Trailer Sales and Bob's Trailer Sales, along with one Doug Jobson (hereinafter referred to as plaintiffs) sought an injunction and damages for unfair competition and restraint of trade against Mertz Enterprises, doing business as San Rafael Mobile Home Estates, Moore's Mobile Home Mart (hereinafter sometimes referred to as defendants), and other mobile home sale companies.

Plaintiffs filed their complaint in the Los Angeles Superior Court on February 21, 1973, and the application for order to show cause and preliminary injunction came on for hearing and was denied on March 6, 1973.

On March 22, 1973, defendants filed a demurrer to the complaint with supporting points and authorities, along with a motion to strike or, in the alternative, a motion for summary judgment. After consolidating all the defendants' motions, the court below, on April 6, 1973, granted their motions for summary judgment and sustained the demurrers without leave to amend.

Plaintiffs appeal from the granting of the motions for summary judgment and the demurrers.

## THE FACTS

Defendant and respondent Mertz Enterprises is the owner and developer of a mobile home park. On or about January 15, 1973, it entered into a written agreement with co-defendants Moore's Mobile Home Mart (MOORE'S), Sunrise County Mobile Homes (SUNRISE) and S. W. Mobile Home Sales (S.W. MOBILE), who are all retail dealers of mobile homes. The purpose of the agreement was to provide a location at which SUNRISE, MOORE'S and S.W. MOBILE could conduct their sales activities and provide lot accommodations for their customers.

In accordance with the agreement, Mertz Enterprises then notified plaintiffs and other mobile home dealers that the San Rafael Mobile Home Estates park was leased full as of January 25, 1973.

On or about January 25, 1973, MOORE'S, by letter, advised other various mobile home dealers that although they had completely rented San Rafael Mobile Home Estates, they would be willing to provide spaces for customers of other mobile home dealers for a set-up fee of approximately $2,500 if plaintiffs and others desired to place a mobile home on defendant's park.

The mobile home dealer defendants state that the set-up fee was necessary because they had received more than 40 complaints, out of 195 mobile homes in the park, which had been submitted to the Contractors License Board, and that in the future to insure high service standards, a set-up charge would be made to service and guarantee a coach for one year.

## CONTENTIONS

Plaintiffs contend that defendants have conspired to restrain trade and commerce with the malicious and oppressive intent to deprive plaintiffs and prospective mobile home purchasers of the right to free and unrestricted competition for the general mobile home sales business.

Plaintiffs' first legal contention is that the contracts and arrangements entered into between the defendants have been declared unlawful per se. This contention is based on plaintiffs' interpretation of the Cartwright Act (Bus. & Prof. Code, § 16700 et seq., which is patterned on the Sherman Antitrust Act).

Plaintiffs' second legal contention is that the motions for summary judgment should have been denied on plaintiffs' general allegations that defendants conspired together for the purpose of restraining competition, even in

the absence of a finding that the agreement constituted a "per se illegal tying arrangement."

DISCUSSION

A summarization of the rules governing summary judgment procedure (Code Civ. Proc., § 437c) was set out in the case of *Corwin* v. *Los Angeles Newspaper Service Bureau, Inc.,* 4 Cal.3d 842 [94 Cal.Rptr. 785, 484 P.2d 953], where the court stated at pages 851-852: ". . . 'The matter to be determined by the trial court in considering such a motion is whether the defendant (or the plaintiff) has presented any facts which give rise to a triable issue. The court may not pass upon the issue itself. Summary judgment is proper only if the affidavits in support of the moving party would be sufficient to sustain a judgment in his favor and his opponent does not by affidavit show such facts as may be deemed by the judge hearing the motion sufficient to present a triable issue. The aim of the procedure is to discover, through the media of affidavits, whether the parties possess evidence requiring the weighing procedures of a trial. In examining the sufficiency of affidavits filed in connection with the motion, the affidavits of the moving party are strictly construed and those of his opponent liberally construed, and doubts as to the propriety of granting the motion should be resolved in favor of the party opposing the motion. Such summary procedure is drastic and should be used with caution so that it does not become a substitute for the open trial method of determining facts.' (*Stationers Corp.* v. *Dun & Bradstreet, Inc.* (1965) 62 Cal.2d 412, 417 [42 Cal.Rptr. 449, 398 P.2d 785]; see *Joslin* v. *Marin Mun. Water Dist.* (1967) 67 Cal. 2d 132, 146-148 [60 Cal.Rptr. 377, 429 P.2d 889].)"[1] (See also *D'Amico* v. *Board of Medical Examiners,* 11 Cal.3d 1, 20 [112 Cal.Rptr. 786, 520 P.2d 10].)

■ Summary judgment, by its nature, should be sparingly granted in cases alleging antitrust activities by defendant. The plaintiff in such a case finds himself outside a door of information that can be opened only by obtaining the key from the defendants. Unless plaintiff is allowed to probe into the secrecy of defendants, he would forever be foreclosed from finding facts to support his contention. "Trial by affidavit is no substitute for trial by jury which so long has been the hallmark of 'even handed justice.'" (*Corwin* v. *Los Angeles Newspaper Service Bureau, Inc., supra,* 4 Cal.3d at p. 852, citing *Poller* v. *Columbia Broadcasting* (1962) 368 U.S. 464,

---

[1]The summary judgment in this case was entered prior to the effective date of the 1973 Summary Judgment Act—January 1, 1974. The review of the judgment is considered only in light of the pre-1974 summary judgment law. (See *D'Amico* v. *Board of Medical Examiners,* 11 Cal.3d 1, 20, fn. 15 [112 Cal.Rptr. 786, 520 P.2d 10].)

473 [7 L.Ed.2d 458, 464, 82 S.Ct. 486]; as quoted with approval in *Fortner Enterprises* v. *U. S. Steel* (1969) 394 U.S. 495, 500 [22 L.Ed.2d 495, 503, 89 S.Ct. 1252].)

". . . On the other hand this rule of caution should not be allowed to sap the summary judgment procedure of its effectiveness in cases wherein the party against whom the procedure is directed seeks to screen the lack of triable factual issues behind adept pleading. 'The question therefore is not whether defendant states a good defense in his answer but whether he can show that the answer is not an attempt "to use formal pleading as means to delay the recovery of just demands." (*Fidelity & Deposit Co.* v. *United States,* 187 U.S. 315, 320 . . . .)' (*Coyne* v. *Krempels* (1950) 36 Cal.2d 257, 262 [223 P.2d 244].)" (*D'Amico* v. *Board of Medical Examiners, supra,* 11 Cal.3d at p. 20.)

Plaintiffs brought their complaint against defendants for restraint of trade under Business and Professions Code sections 16720 to 16726 (the Cartwright Act).[2]

■  "Sections 16720 and 16726 of the Cartwright Act were patterned after the Sherman Act (15 U.S.C. § 1 et seq.) and decisions under the latter act are applicable to the former. (*Chicago Title Ins. Co.* v. *Great Western Financial Corp.* (1968) 69 Cal.2d 305, 315 [70 Cal.Rptr. 849, 444 P.2d 481].) Both acts codify the general common law prohibition against restraints of trade. Section 16727 goes beyond the common law to interdict

---

[2]Section 16720 provides in part: "A trust is a combination of capital, skill or acts by two or more persons for any of the following purposes: [¶] (a) To create or carry out restrictions in trade or commerce . . . (c) To prevent competition in . . . sale or purchase of merchandise. . . . (d) To fix at any . . . figure, whereby its price to the . . . consumer shall be in any manner controlled or established, . . . (e) To make or enter into or execute or carry out any contracts, obligations or agreements of any kind or description, by which they do all or any or any combination of any of the following: [¶] . . . (4) Agree to pool, combine or directly or indirectly unite any interests that they may have connected with the sale or transportation of any such article or commodity, that its price might in any manner be affected."

Section 16726 of the Business and Professions Code states: "Except as provided in this chapter, every trust is unlawful, against public policy and void."

Section 16727 of the Business and Professions Code states in part: "It shall be unlawful for any person to lease or make a sale or contract for the sale of goods, merchandise, . . . commodities for use within the State, or to fix a price charged therefor, or discount from, or rebate upon, such price, on the condition, agreement or understanding that the lessee or purchaser thereof shall not use or deal in the goods, merchandise, . . . supplies, commodities, or services of a competitor or competitors of the lessor or seller, where the effect of such lease, . . . agreement or understanding may be to substantially lessen competition or tend to create a monopoly in any line of trade or commerce in any section of the State."

certain practices which have a tendency to lessen competition or promote monopolization. This section, enacted in 1961 (Stats. 1961, ch. 738), is based on section 3 of the Clayton Act (15 U.S.C. § 14). Hence, federal decisions interpreting section 3 are applicable to section 16727. (69 Cal.2d 305, 315.)

"Although the Sherman Act and the Cartwright Act by their express terms forbid all restraints on trade, each has been interpreted to permit by implication those restraints found to be reasonable. (*Standard Oil Co.* v. *United States* (1911) 221 U.S. 1, 60 [55 L.Ed. 619, 645, 31 S.Ct. 502]; *People* v. *Building Maintenance etc. Assn.* (1953) 41 Cal.2d 719, 727 [264 P.2d 31].) 'However, there are certain agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use. . . . Among the practices which the courts have heretofore deemed to be unlawful in and of themselves are price fixing [citation]; division of markets [citation]; group boycotts [citation]; and tying arrangements [citation].' (*Northern Pac. R. Co.* v. *United States* (1958) 356 U.S. 1, 5 [2 L.Ed.2d 545, 549, 78 S.Ct. 514].)"[3] (*Corwin* v. *Los Angeles Newspaper Service Bureau, Inc., supra,* 4 Cal.3d at pp. 852-853.)

■  Plaintiffs' first claim is that the agreement between MOORE'S, SUNRISE, S.W. MOBILE and Mertz Enterprises constituted an illegal restraint of trade. To prevail in this contention, "it must appear from the record not only that the agreements 'create or carry out restrictions in trade' (§ 16720, subd. (a)) but also that such restrictions are unreasonable." (*Corwin, supra,* 4 Cal.3d at p. 853.)

■  Plaintiffs base this contention on two items, a letter sent by Mertz Enterprises to plaintiffs telling them that as of January 22, 1973, the mobile home park would be leased in full,[4] and the contract/agreement between Mertz Enterprises and the other defendants for the leasing of part of the mobile home park.[5]

On January 15, 1973, Mertz Enterprises and the codefendants entered into an agreement for the rental of mobile home spaces. There is no men-

---

[3]See also *Chicago Title Ins. Co.* v. *Great Western Financial Corp.,* 69 Cal.2d 305, 328-336 [70 Cal.Rptr. 849, 444 P.2d 481], dissent by J. Mosk.

[4]Plaintiffs' exhibit 4 to their complaint.

[5]This agreement was not part of plaintiffs' complaint, but came to light as part of defendants' papers in response to plaintiffs' request for an injunction. The agreement was filed with the court before the summary judgment was filed.

tion of what the rent is in terms of dollars and cents in the agreement, but simply a statement that Mertz Enterprises will rent specific spaces to the codefendants for a period of one year; that the codefendants would be the only parties allowed to sell mobile homes in the mobile home park; and that they would be permitted to maintain a model compound and sales office on the park premises. The rent paid by the codefendants to Mertz Enterprises would be the percentage each codefendant has of the entire area covered by the agreement. The rental paid by the codefendants would be reduced by the amount of rental paid to Mertz Enterprises by the occupants of the respective spaces, but only to an offset for rent actually paid by such occupants.

The clause entitled "3. *Occupants and Lot Improvement Charge*" could be construed to support plaintiffs' claim that the arrangement between Mertz Enterprises and the codefendants is more than a normal lessor-lessee relationship. Mertz Enterprises states that all potential occupants procured by the codefendants must have new double coaches which must be approved by Mertz Enterprises and which must obey all park rules. Furthermore, "[c]oncurrently with any rental arrangement by MERTZ with a potential resident of any of the spaces procured by RETAILERS [codefendants], MERTZ will charge such resident the sum of Two Hundred Fifty Dollars ($250.00) payable concurrently on or prior to occupancy. . . . The total lot improvement charge shall be paid by MERTZ to RETAILERS [codefendants] within 10 days after receipt of payment from resident. In the event that a loss results from any claim made against MERTZ as the result of the payment of said lot improvement charge to MERTZ and thereafter to RETAILERS [codefendants], then each of the RETAILERS [codefendants] herein agrees to reimburse MERTZ a pro rata share of said loss not to exceed twenty-five percent (25%) of the total monies received by said RETAILERS [codefendants]."

Clause 4 of the agreement, entitled *"Model Complex and Sales Facility,"* provides in relevant part that: "RETAILERS [codefendants] may install signs and other advertising and promotion as it may deem advisable after having first obtained the written consent of MERTZ. MERTZ agrees that such consent shall not be unreasonably withheld. RETAILERS [codefendants] shall have the right to use the name of SAN RAFAEL MOBILE HOME ESTATES in its advertising and promotion, but such advertising and promotion shall not in any way indicate any agency, joint venture, partnership or other relationship between RETAILERS [codefendants] and SAN RAFAEL MOBILE HOME ESTATES. The mobile home park manager of MERTZ and their employees shall cooperate with RETAILERS [codefendants] in connection with its sales

and promotion for the mutual benefit of all parties hereto in renting mobile home spaces as well as promoting the sale of mobile homes by RETAILERS [codefendants]. The cooperation by RETAILERS and MERTZ, as well as their respective employees, shall be reasonable and in their best interests."

The agreement between Mertz Enterprises and its codefendants gives an exclusive right of sale to the codefendants on the leased/rented property; allows for reimbursement of payments; and provides for aid, assistance and cooperation for the sale of codefendants' mobile homes at the inferred exclusion of other individuals' sale of mobile homes to be placed on this property.

The above agreement between Mertz Enterprises and its codefendants cannot be considered in a vacuum, but must be considered in light of all the agreements between the defendants and how those agreements would eventually affect the public and competitors.

Plaintiffs allege in their complaint that MOORE'S, SUNRISE and S.W. MOBILE conspired together, along with Mertz Enterprises to divert and take away a substantial portion of the business of plaintiffs. Plaintiffs support this contention by relying on a letter sent by MOORE'S, SUNRISE and S.W. MOBILE to plaintiffs and other dealers on January 25, 1973. The letter, addressed "Dear Fellow Dealer," informed plaintiffs and others that if they wished "to place a coach in San Rafael, we will deliver, set-up and service—and this service will be guaranteed for one (1) full year—your coach for a total cost of $2500. This will insure high service standards." An asterisk at the bottom of the letter indicates a note stating: "Since each dealer above is an individual company and sets its own prices, the $2500 costs is approximate."

The effect of the agreement and the letter to the ultimate consumer is as follows: If the purchaser buys from MOORE'S, SUNRISE or S.W. MOBILE, the purchaser will pay $250 to Mertz Enterprises as a set-up charge—which charge will be returned to the codefendant who sold the coach. If the purchaser buys a coach from plaintiffs, the set-up fee will be $2,500—a cost that undoubtedly would be passed on to the ultimate consumer who therefore has to pay more to buy from plaintiffs if he wishes his coach put on the Mertz Enterprises lot.

Section 16727 of the Business and Professions Code is concerned with the effects on competition, and the type of arrangement described above could be construed to seriously impair competition between parties not in privity with the arrangements between the defendants.

■ In examining the agreements between the parties and the statutes involved, the effects on competition, not just the competitors, must be considered. The substantially probable rather than actual effects are all that is required by the Cartwright Act as it has been interpreted by federal cases. (See *Standard Motor Products, Inc.* v. *F.T.C.* (2d Cir. 1959) 265 F.2d 674, 676, regarding interpretation of Robinson-Patman Price Discrimination Act, 15 U.S.C.A. § 13a.)

■ If the agreements between Mertz Enterprises and the other defendants are construed to constitute a restraint upon trade, "they violate the Cartwright Act unless they are shown to be reasonable. ■ To determine whether the restrictions are reasonable, 'the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be obtained, are all relevant facts.' (*Chicago Board of Trade* v. *United States* (1918) 246 U.S. 231, 238 [62 L.Ed. 683, 687, 38 S.Ct. 242].) The court should consider 'the percentage of business controlled, the strength of the remaining competition [and] whether the action springs from business requirements or purpose to monopolize. . . .' (*United States* v. *Steel Co.* (1948) 334 U.S. 495, 527 [92 L.Ed. 1533, 1554, 68 S.Ct. 1107]; quoted with approval in *Times-Picayune* v. *United States* (1953) 345 U.S. 594, 615 [97 L.Ed. 1277, 1293, 73 S.Ct. 872].) Whether a restraint of trade is reasonable is a question of fact to be determined at trial. (*Times-Picayune* v. *United States, supra; Chicago Board of Trade* v. *United States, supra; Winn Ave. Warehouse, Inc.* v. *Winchester Tobacco Ware. Co.* (6th Cir. 1964) 339 F.2d 277, 280; *Rogers* v. *Douglas Tobacco Board of Trade, Inc.* (5th Cir. 1959) 266 F.2d 636, 643, cert. den. (1959) 361 U.S. 833 [4 L.Ed.2d 75, 80 S.Ct. 85].)" (*Corwin, supra,* 4 Cal.3d at pp. 854-855.)

Another contention of plaintiffs is that the agreements, considered jointly and severally constitute an illegal tying arrangement.

■ " 'For our purposes a tying arrangement may be defined as an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier. Where such conditions are successfully exacted competition on the merits with respect to the tied product is inevitably curbed. Indeed "tying agreements serve hardly any purpose beyond the suppression of competition." [Citation.] They deny competitors free access to the market for the tied product, not because the party im-

posing the tying requirements has a better product or a lower price but because of his power of leverage in another market. At the same time buyers are forced to forego their free choice between competing products. For these reasons "tying agreements fare harshly under the laws forbidding restraints of trade." [Citation.]' (Fns. omitted.) (*Northern Pac. R. Co.* v. *United States, supra,* 356 U.S. 1, 5-6 [2 L.Ed.2d 545, 550].) Tying arrangements are illegal per se 'whenever a party has sufficient economic power with respect to the tying product to appreciably restrain free competition in the market for the tied product' (*Northern Pac. R. Co.* v. *United States, supra,* 356 U.S. at p. 6 [2 L.Ed.2d at p. 550]; *Fortner Enterprises* v. *U.S. Steel, supra,* 394 U.S. 495, 499, 503 [22 L.Ed.2d 495, 502, 505]) and when 'a total amount of business, substantial enough in terms of dollar-volume so as not to be merely *de minimis,* is foreclosed to competitors by the tie. . . .' (*Fortner Enterprises* v. *U.S. Steel, supra,* 394 U.S. at p. 501 [22 L.Ed.2d at p. 504].)" (*Corwin, supra,* 4 Cal.3d at pp. 856-857.)

We conclude that triable issues have been raised which, if resolved in plaintiffs' favor, could establish the type of arrangement condemned by the above referred to decisions. We do not hold as a matter of law that the arrangements between defendants amount to an illegal tying agreement, but rather that it is an issue to be resolved at trial.

Accordingly, we hold that plaintiffs are entitled to a trial on their general theory of a conspiracy and combination in restraint of trade and also upon their claim of an illegal tying arrangement. We further hold that plaintiffs may proceed to trial on their complaint without the necessity of amending. (See *Jaffe* v. *Carroll,* 35 Cal.App.3d 53 [110 Cal.Rptr. 435].)

Judgment reversed.

Lillie, Acting P. J., and Thompson, J., concurred.