[Civ. No. 24043. Fourth Dist., Div. One. Oct. 8, 1981.]

EDMUND V. SAWYER et al., Plaintiffs and Appellants, v. FIRST CITY FINANCIAL CORPORATION, LTD., et al., Defendants and Respondents.

392

COUNSEL

Weissman, Johns & Gamer and Peter P. Gamer for Plaintiffs and Appellants.

Seltzer, Caplan, Wilkins & McMahon, Gerald L. McMahon, James B. Person, Orrick, Herrington & Sutcliffe, William L. Riley, George A. Yuhas, Platt, Tebbetts & Peterson, Harold F. Tebbetts, Linda E. Boelhauf and Sanford R. Demain for Defendants and Respondents.

OPINION

FROELICH, J.*—Plaintiffs appeal from adverse summary judgment rulings in favor of all defendants. An understanding of the litigation requires an analysis of two separate cases involving essentially the same parties, of which the present appeal relates specifically to the second. For reference purposes these two cases will be called Sawyer I and Sawyer II. Each case arises from the same general factual background.

---

*Assigned by the Chairperson of the Judicial Council.

*Factual Background*

The principal parties to both cases are the plaintiffs Sawyer, owners and sellers of land; the defendants First City Financial Corporation, Ltd. (First City) and its subsidiaries, purchasers and encumbrancers of the land who sought to develop it; and Toronto Dominion Bank of California, the development lender to First City's subsidiary. The broad brush of facts is that in May of 1974 the Sawyers sold 32 acres of land in La Jolla, California, to the subsidiary of First City—F. C. Financial Associates, Ltd.—for $1,180,000 consisting of $510,000 in cash and a note secured by deed of trust in the sum of $670,000. Concurrently with the sale, F. C. Financial Associates committed to borrow $1.8 million in the form of a development loan from Toronto Dominion Bank. This loan was guaranteed by First City and was secured by a first deed of trust on the realty, the Sawyers specifically subordinating their deed of trust to the new encumbrance. The Sawyers as part of the sales documents specifically waived any deficiency judgment with respect to their note and deed of trust, with the result that after the sales and refinancing escrows closed their sole resource for collection of their $670,000 note was foreclosure on their deed of trust, now subordinate to a $1.8 million first deed of trust to the Bank.

Early in 1975, F. C. Financial Associates discontinued payments on the note to Toronto Dominion Bank, asserting that it could not proceed further with development of the land because the construction bids it had received were excessively high. Total amounts owed on the note at that time approximated $900,000. Toronto Dominion Bank commenced nonjudicial foreclosure proceedings on April 1, 1975, and purchased the land at foreclosure sale in September 1975, for its bid of $650,000. The land was ultimately transferred in December 1976 to Lexington Properties, Inc., a corporation owned by one Richard Ehrlich, for a purchase price of some $800,000.

The Sawyers contend in pleadings and other documentation that at the time of the foreclosure sale Toronto Dominion Bank had agreed to resell the realty to First City for a price equal to the bank's total investment in it, but that this transfer was delayed until the sale to Ehrlich and his corporation could be arranged, so that neither First City nor its subsidiary again appeared as record titleholder. Ehrlich and his corporation obtained development funds for the property from a corporation called Lomitas Properties, Inc., which is a corporation owned and con-

trolled by the majority stockholders, directors and officers of First City, and which derived its funds from First City.

Appellant's view of the facts, therefore, is that the Sawyers were induced to take a nonrecourse note for more than half the consideration involved in the sale of their land, the security for which note was made subject to a large development loan. The development borrower then defaulted on the note and arranged with the development lender to foreclose, to buy in at the foreclosure sale, and to resell to the development borrower for the amount of the foreclosure sales price plus the balance of the loan guarantee. The practical effect of this transaction, it is alleged, was to wipe out the obligation to the Sawyers and permit First City to proceed with sale or development of the land without having to pay $650,000 of the purchase price. In order to avoid airing the mechanics of the transaction, the agreement between the Toronto Dominion Bank and First City was kept secret, and the resale to First City was not recorded, the ultimate purchaser being a puppet of First City set up in an apparently independent corporation, borrowing funds from a new and anonymous lending company, but actually deriving development funds indirectly from First City. We are alert to caution that the above construction of the facts from and after the foreclosure sale is that alleged by the plaintiffs, who seek the opportunity of proving same in a full-scale evidentiary trial.

*Legal Proceedings*

*Sawyer I*

Sawyer I was commenced in July of 1975. The defendants were F. C. Financial Associates, its parent First City, and, later, another subsidiary of First City (all sometimes called herein Financial); and Toronto Dominion Bank of California (Bank). The several causes of action all were based upon contractual theories. Reference was made to the land acquisition and development loan agreement executed between Financial and Bank, which provided for the construction of a planned residential development in accordance with an existing permit. The Sawyers alleged that they were third party beneficiaries of that agreement and had been damaged by the failure of Financial to perform in accordance with it. The breach is alleged not only as a simple breach of contract, but as a breach by the defendants of "a contractual duty of good faith and fair dealing." A separate cause of action asks for declaratory relief with respect to the contractual commitments; and a

final cause of action seeks judicial foreclosure of the Sawyer note. The monetary relief prayed for was the amount of the note ($674,500) plus attorney fees.

The case was tried in February of 1978. By stipulation the issues were severed for trial and dispositive issues were presented to a judge, sitting without jury. The judgment rendered in March of 1978, focused upon the issue of the validity of the waiver by Sawyers of their right to a deficiency judgment. This waiver was found to be effective and judgment was rendered in favor of all defendants on all causes of action. Following affirmance on appeal, the judgment became final in December of 1979.

## Sawyer II

Sawyer II was filed in January of 1978. Entitled "Complaint for Damages Based Upon Conspiracy and Fraud," it joined as defendants all of the parties named in Sawyer I and in addition the ultimate purchaser Ehrlich and his corporation, Lexington Properties; the new financier of the development, Lomitas Properties; and a number of officers and directors of the Financial companies and the Bank. Three of the causes of action of this new lawsuit are based upon an alleged conspiracy among the defendants to cause a default in the Bank's note and trust deed, hold a sham sale, and take other action for the purpose of eliminating the obligation to the Sawyers. The only essential difference in the three causes of action is the date of commencement of the alleged conspiracy—one alleging the evil motives from the very start of the land acquisition transaction, a second alleging commencement of the conspiracy when Financial defaulted on its note payments, and a third alleging commencement of the conspiracy at the time of the foreclosure sale. The fourth cause of action uses the same factual allegations as the basis for a claim of intentional interference with contractual relation (Financial's note obligation to the Sawyers). Damages alleged are the same as in Sawyer I except that additional punitive damages are sought.

The procedural history of Sawyer II is detailed as follows:

1. Promptly upon filing Sawyer II, counsel sought to consolidate with Sawyer I, and moved for a continuance of the trial of Sawyer I. This motion was opposed by the defendants, who objected because the issues and causes of action of Sawyer II were different from those of Sawyer

I, and also because the case, then pending for two and one-half years, was scheduled for trial nine days later. The court denied a motion to continue the trial of Sawyer I, and it was tried without consolidation with Sawyer II.

2. In January of 1980, the Bank and its officers moved for summary judgment in Sawyer II upon the ground of the res judicata effect of Sawyer I, and also upon the basis of a written release which had been executed in favor of the Bank in Sawyer I—removing the Bank from the case before its trial. The Honorable Douglas Woodworth denied the motion based upon res judicata, but granted the motion as to the Bank only, upon the ground of the written waiver. The bank officers moved for reconsideration on the theory that the waiver should be construed to cover them as well as the Bank, and this motion was taken under submission by the judge in March of 1980. On July 24, 1980, Judge Woodworth denied the motions by written minute order.

3. In May of 1980, a separate motion for summary judgment was filed by the Financial corporations on the ground that Sawyer I was res judicata to the issues of Sawyer II—that the plaintiffs had split their cause of action by attempting to relitigate the same issues in a second lawsuit. The bank officers (whose motion for reconsideration was then pending before Judge Woodworth) joined in this motion, and it was set for hearing before the Honorable Franklin B. Orfield. On July 25, 1980, Judge Orfield ruled in favor of all defendants on the ground of res judicata and the enforceability of the Bank's written release in Sawyer I.

### The Appeal

Appellants appeal from the summary judgments of both Judge Woodworth (dismissing the Bank) and Judge Orfield (dismissing all parties), and also from a discovery ruling (described *infra*). Many bases of appeal are urged: The central and most important issue, however, is the question of res judicata. As reviewed in 3 Witkin, California Procedure (2d ed. 1971) Pleading, section 32 et seq., page 1715, a single cause of action cannot be split and made the subject of several suits. If a primary right is so split, determination of the issues in the first suit will be res judicata to the attempt to relitigate them in the second suit. Where the plaintiff has several causes of action, however, even though they may arise from the same factual setting, and even though they might have been joined in one suit under permissive joinder provisions,

the plaintiff is privileged to bring separate actions based upon each separate cause.

## Res Judicata Issue

■ A valid final judgment on the merits in favor of a defendant serves as a complete bar to further litigation on the same cause of action. (*Slater* v. *Blackwood* (1975) 15 Cal.3d 791, 795 [126 Cal.Rptr. 225, 543 P.2d 593].) ■ The question in this and similar cases, of course, is whether the attempted second litigation involves the "same cause of action." A "cause of action" is conceived as the remedial right in favor of a plaintiff for the violation of one "primary right." That several remedies may be available for violation of one "primary right" does not create additional "causes of action." However, it is also true that a given set of facts may give rise to the violation of more than one "primary right," thus giving a plaintiff the potential of two separate lawsuits against a single defendant. (See 3 Witkin, *supra*, p. 1707 et seq.)

The theoretical discussion of what constitutes a "primary right" is complicated by historical precedent in several well-litigated areas establishing the question of "primary rights" in a manner perhaps contrary to the result that might be reached by a purely logical approach. For instance, the primary right to be free from personal injury has been construed as to embrace all theories of tort which might have given rise to the injury. In *Panos* v. *Great Western Packing Co.* (1943) 21 Cal.2d 636 [134 P.2d 242], the plaintiff was injured in a meat packing house. His first cause of action was based upon alleged negligence of the packing house in permitting third parties to come upon the premises and operate equipment. A defense judgment was then held to bar a second suit based upon an entirely different factual theory of negligence—that the defendant itself had negligently operated the equipment. In *Slater* v. *Blackwood, supra*, 15 Cal.3d 791, a defense judgment in a suit based upon violation of the guest statute (intoxication or willful misconduct) was held to bar a second suit (after the guest statute was held unconstitutional) based upon allegations of ordinary negligence.

Other examples of torts resulting in easily conceptualized types of damages have been settled, one way or the other, by precedent. While one act of tortious conduct might well be deemed to violate only one "primary right"—the right to be free from the particular unlawful conduct—the resultant (1) injury to person and (2) damage to property

have been deemed creative of separate causes of action. On the other hand, one course of wrongful conduct which damages several pieces of property traditionally gives rise to only one cause of action. (See 3 Witkin, *supra*, at pp. 1720-1721, and cases cited therein.)

Other classes of litigation, however, with perhaps less historical or precedential background, are not so well defined in terms of deciding how many "primary rights" derive from a single factual transaction. The tort in *Agarwal* v. *Johnson* (1979) 25 Cal.3d 932 [160 Cal.Rptr. 141, 603 P.2d 58], was unfair treatment of a minority race employee by an employer. Plaintiff's first action was in federal court for back wages under the authority of the federal Civil Rights Act. The state Supreme Court determined this was no bar to a second suit in superior court for general and punitive damages for defamation and intentional infliction of emotional distress. Although the same set of facts is presented in each claim, one primary right is created by the federal statute prohibiting discriminatory employment practices; and the second primary right is grounded in state common law. Also, the "harm suffered" was deemed separable—damages for lost wages in the federal action, and damages for injury to reputation and peace of mind in the state case. Compare *Mattson* v. *City of Costa Mesa* (1980) 106 Cal.App.3d 441 [164 Cal.Rptr. 913], where the actionable facts consisted of an unlawful arrest of the plaintiff and his abuse in confinement. His first action in federal court under the authority of the Civil Rights Act was held to be a bar to a subsequent suit in state court for negligence, assault and battery. The court found that the "primary rights" giving rise to the state common law tort action were the same as those reflected in the Civil Rights Act, and that the civil rights action was "simply a different way of expressing an invasion of the same primary rights or the assertion of a different legal theory for recovery." (*Id.*, at pp. 447-448.) In *City of Los Angeles* v. *Superior Court* (1978) 85 Cal.App.3d 143, 153 [149 Cal.Rptr. 320], a federal civil rights action followed by a superior court common law tort action, both involving wrongful seizure of personal property, the appellate court reached the same conclusion and applied the bar of res judicata on the ground that "the civil rights action was designed to vindicate precisely the same interests in ... personal property that (the plaintiff) seeks to vindicate in the matter before us."

One would assume that the question of litigation of claims arising from one transaction first on the basis of contract, and then on alleged tort theories, would have received substantial appellate attention. The

authorities, however, are surprisingly sparce. The Restatement of the Law, Judgments (1942) chapter 3, section 63, page 261, provides several illustrations involving actions to cancel a deed. A failure to sustain the first action on contractual grounds (i.e., failure of execution or delivery of the deed) is held to bar a subsequent action based upon fraudulent procurement—thus suggesting that the "primary right" is the right to cancel the deed (as applied to our case, to validate the note) and that this gives rise to only one cause of action, whether it be framed in contract or tort.

Respondents rely upon two cases which purport to be illustrative of contract actions followed by separate tort actions, arising from the same transaction: *Olwell* v. *Hopkins* (1946) 28 Cal.2d 147 [168 P.2d 972]; and *Steiner* v. *Thomas* (1949) 94 Cal.App.2d 655 [211 P.2d 321]. The plaintiff's claim in *Olwell* resulted from farming operations carried on by a joint venture which included a Washington corporation. In the first suit the action was dismissed without a trial of the substantive issues on the ground that the corporation had never qualified to do business in California with the result that the contract upon which the suit was based was "void." A second suit based upon the same transaction alleged fraudulent concealment of facts and prayed that the defendants be declared constructive trustees of certain realty. While this scenario would seem to pose a problem similar to that of the case before us, it was resolved without addressing the issue of the existence of separate causes of action in contract and for fraud. The court assumed (and presumably counsel did not argue to the contrary) that there was only one cause of action, and that the second suit was merely an alternative statement of that one cause of action. (See *Olwell* v. *Hopkins, supra,* 28 Cal.2d at pp. 149, 150.) The question directly addressed by the court was the effect of dismissal of the first suit without a trial on the merits, and whether such dismissal on procedural grounds would operate as a bar to a second action, recognizing that in order to constitute a bar, the dismissal must have been following "'an adjudication of the merits of the controversy, . . .'" (*Id.,* at p. 149.)

In *Steiner,* two successive actions were brought against an administrator of a decedent's estate for the purpose of recovering a certain parcel of real property which had been transferred to the decedent by the plaintiff before the decedent's death. The first action was for rescission based upon fraud, alleging that the realty had been transferred so as to permit the decedent to collect rents and that the decedent had promised to reconvey the property at a later date. The second lawsuit

was based upon an alleged breach of an agreement to devise the property to the plaintiff, as evidenced by two letters from the decedent to the plaintiff. The court resolved the question of res judicata against the plaintiff, focusing on the identity or similarity of facts litigated in the first suit as compared to those in issue at the second suit. The court stated: "The fact is that in the former action the merits of all the facts were determined and relief was denied .... Upon presentation of the special plea in the instant action the court had merely to decide whether the facts alleged in the first suit for rescission of the contract were substantially those alleged in the second action for breach of the same contract." (*Steiner* v. *Thomas, supra*, 94 Cal.App.2d at p. 658.) The court thus construed the situation as one in which alternative remedies in contract were successively brought—related to the same contract—rather than a case in which an action on contract was followed by an action for an intentional tort related to or as part of the transaction giving rise to the contract. Neither *Orwell* nor *Steiner* appears controlling.

The case before us is not one in which the same factual structure is characterized in one complaint as a breach of contract and in another as a tort. The first action is solely on contract and is based upon the note, deed of trust, and loan and development agreement. At the time of trial the principal issue litigated was the effectiveness of the waiver of deficiency judgment, and this issue was presented in the context of contractual theories. There was no contention and no evidence was presented relating to a possible invalidation of the waiver on grounds of fraud, misrepresentation or any other tort.

Sawyer II, of course, had as its object collection of the same promissory note which was the subject matter of Sawyer I; but the basis of the claim is completely different, and rests upon a completely separate set of facts. The complaint assumes and admits that the forms of the waiver of deficiency and the subordination are technically appropriate and enforceable. The pleading reaches beyond these documents, however, to highlight other conduct of the parties alleged to be tortious. The core of the alleged wrongful conduct is an agreement among the parties to conduct what is characterized as a sham foreclosure sale, the only substantive effect of which would be secretly to discharge the obligation to Sawyer, leaving all other parties in essentially the same position as prior to the sale. Surely one's breach of contract by failing to pay a note violates a "primary right" which is separate from the "primary right" not to have the note stolen. That the two causes of action might have been joined in one lawsuit under our permissive joinder provisions (see 3

Witkin, *supra*, at p. 1915) does not prevent the plaintiff from bringing them in separate suits if he elects to do so. While the monetary loss may be measurable by the same promissory note amount, and hence in a general sense the same "harm" has been done in both cases, theoretically the plaintiffs have been "harmed" differently by tortious conduct destroying the value of the note, than by the contractual breach of simply failing to pay it. We conclude, therefore, that Sawyer II is based upon a separate and severable cause of action from that litigated in Sawyer I, and that it was error to grant summary judgment on the ground of res judicata.

### *Estoppel*

■ A second prong to appellant's argument about the summary judgment ruling as respects res judicata is that the moving parties were estopped to deny the separate nature of the two causes of action because they had earlier opposed a motion to consolidate the two cases. Appellants rely upon *United Bank & Trust Co.* v. *Hunt* (1934) 1 Cal. 2d 340 [34 P.2d 1001], where the court at page 345 stated: "'Where counsel by timely notice call to a court's attention the pendency of other proceedings covering kindred matters and strive to have the same embraced within the scope of the inquiry, and such attempt is successfully blocked by opposing counsel and the trial proceeds to the investigation of the specific issue before the court, counsel who were successful in preventing the consolidation of the issues cannot be heard later to object to a trial of the related matters upon the ground of *res judicata.* The course pursued by the court and counsel . . . was tantamount to an express determination on the part of the court with the consent of opposing counsel to reserve the issues involved for future adjudication. [Citation.] Litigants cannot successfully assume such inconsistent positions.'"

The inconsistent position asserted to have been taken by defense counsel was at the time of the hearing of a motion to continue the trial of Sawyer I. Sawyer I was filed in July of 1975. Plaintiffs filed a memorandum that the case was at issue in February 1976. On January 6, 1977, a trial setting conference was held, and a settlement conference was scheduled for September 13, 1977, with trial scheduled for September 29, 1977. On September 12, 1977, plaintiffs filed a motion to continue the trial date, which was heard on September 19, 1977, and resulted in a continuance to February 15, 1978. On February 5, 1978, nine days before the continued trial date, plaintiffs brought another mo-

tion for continuance of the trial, upon the ground that they had filed Sawyer II and wished to have time before the trial of Sawyer I to file and hear a motion for consolidation.

At the hearing of the motion for continuance on February 6, counsel for the defendants did argue that the case should not be continued to permit consideration of a consolidation motion because consolidation would be improper by virtue of the different theories and causes of action in Sawyer II. However, no express argument was made about, nor consideration given, to the question of the res judicata effect of the prior trial of Sawyer I. In light of the long period of preparation for trial and the then once-continued trial date impending only nine days hence, the trial court presumably considered further continuance to be prejudicial to the rights of the defendants. A court is not required to grant a continuance of a trial when the pleadings have been completed, adequate time for discovery has been provided, the issues are joined, and one side is ready for trial, even though the moving party alleges newly discovered facts or newly found issues which suggest more discovery or an amendment to the pleadings. (See *County of San Bernardino* v. *Doria Mining & Engineering Corp.* (1977) 72 Cal.App.3d 776, 783 [140 Cal.Rptr. 383].)

The reasonable interpretation to be derived from a review of the record in Sawyer I was that the court denied the motion for continuance because Sawyer I was ready for trial, had been delayed previously and should not be delayed further. Therefore, while we have determined that the motion for summary judgment should not have been granted on the ground of res judicata, we must agree with the trial court that the moving parties were not estopped by their prior conduct from making the motion.

### Mutual General Release: Toronto Dominion Bank

On January 3, 1977, the Sawyers and the Bank entered into a mutual release. The document was very broad in scope, releasing the Bank from "all claims, demands, liabilities and causes of action which the parties ever had, now have, or may have against each other arising out of any fact or event occurring prior to the date of this agreement." Reference was made to the then pending Sawyer I, and the release provided that it "includes but is not limited to the release by Plaintiffs of the Bank from the causes of action alleged by Plaintiffs in [Sawyer I]." The release further referenced and waived the provisions of Civil Code

section 1542, affirming it to be the intention of the parties to release all then existing claims, whether known or unknown. The existence of the release was the basis for Judge Woodworth's summary judgment in favor of the Bank.

■ Appellant does not contest the due execution and legal effect of the release, insofar as it pertains to tortious activities of the Bank prior to January 3, 1977. Appellant points, however, to the contention in Sawyer II that the various parties were involved in a conspiracy to defraud the Sawyers, and cites *de Vries* v. *Brumback* (1960) 53 Cal.2d 643 [2 Cal.Rptr. 764, 349 P.2d 532], for the proposition that one who joins a conspiracy is liable for all wrongful actions of the conspirators, even though they occurred before his commitment to the enterprise. Even though the prior wrongful acts of the Bank were wiped clean by the release of January 3, 1977, appellant argues, continued efforts by the Bank *after* January 3, 1977, renew its conspiratorial status and revive liability for the whole transaction.

The trial court judge considered this argument and reviewed the dates of major occurrences in the transaction, which were as follows: The property was purchased in 1974; default on the Bank's note occurred early in 1975; the Bank filed a notice of default in April 1975; the trustee's sale occurred on September 4, 1975; the alleged conspiratorial agreement was entered into in September 1975; extension agreements between the Bank and Financial continued throughout 1976 during which period the purchasing corporation, Lexington, was formed and funded; and title to the property was finally conveyed to Lexington and Ehrlich in December of 1976. In response to the Bank's contention that all events involved in the conspiracy had taken place by the time of the execution of the release, appellant points to a letter dated February 1, 1977, from the Bank to Financial enclosing a $300,000 note from Lexington made to the order of the Bank, which had been endorsed to Financial. Appellant suggests that this is evidence of division and distribution of the "spoils" of the conspiracy and has the effect of reopening the door of liability for all prior events. After considering this argument, the trial court stated:

"The summary judgment is granted in favor of the Bank. I do not think there are any inferences available from the declarations before the Court that would suggest a further subsisting course of conspiratorial conduct by the Bank after January 3, 1977.

"I think the whole core of the Sawyer II lawsuit, the present lawsuit, was within the contemplation of the parties at the time that mutual release was entered into.

".     .     .     .     .     .     .     .     .     .     .     .     .     .     .

"... I think the proper analogy to the robbery case would be that if there were an immunity given by the District Attorney as to all matters arising out of a certain robbery on a certain date, then it would certainly be arguable that immunity would carry forward a little bit to the incidental activity of dividing up the loot among the robbers, if they'd already been given an overriding immunity against the consequences of the robbery.

"And, here, there must be in this kind of case some contemplation that the releasee will be able to conduct ordinary and reasonable business after the date of the release, even though it might relate to the previous subject matter of an alleged conspiracy....

"The principal ruling is that there simply are not inferences available, in my opinion, that would suggest that the lawsuit could be maintained against the Bank."

The granting of a summary judgment is a drastic remedy, and if there is any issue of material fact to be tried, summary judgment must be denied. (*Hepp* v. *Lockheed-California Co.* (1978) 86 Cal.App.3d 714, 717 [150 Cal.Rptr. 408].) The trial court is, however, to some extent required to weigh evidence in determining whether the factual issues asserted relate to a "material fact," and must determine what "inferences [are] reasonably deducible from [the] evidence." (Code Civ. Proc., § 437c.) This is not simply a process of mechanical sifting of affidavits to determine whether a theoretical issue has been uncovered, regardless of how minor or remote. The trial court judge is entitled and required to utilize discretion in viewing and weighing questions of substance and materiality of asserted disputed facts. (See *Larsen* v. *Johannes* (1970) 7 Cal.App.3d 491, 507 [86 Cal.Rptr. 744]; cf. *Sherman* v. *Mertz Enterprises* (1974) 42 Cal.App.3d 769, 774 [86 Cal.Rptr. 744].) In reviewing the affidavits and factual matters before the trial court we conclude that its decision was warranted by the evidence, and that it did not abuse its discretion in granting the summary judgment.

*Mutual General Release—Toronto Dominion Bank Officers*

While Judge Woodworth denied the motion of the two bank officers, Klugherz and McIntosh, for summary judgment based upon the release, Judge Orfield later included this as a ground for dismissal of the officers in his summary judgment. Having concluded that the release was effective insofar as the Bank is concerned, and the same evidence relating to the officers as pertained to the Bank, the officers are entitled to a dismissal if the release can be construed as a matter of law to cover them.

The only parties to the release are the Sawyers and the Bank. The phraseology of the release is directed solely to the Bank. The contention that it embraces the bank officers is based upon the last paragraph of the document, which provides: "This release shall bind the undersigned and inure to the benefit of the parties and their respective employees, administrators, personal representatives, successors and assigns. . . ."

Appellant argues that this paragraph is illogical and ambiguous. In its reference to "successors and assigns," for instance, appellant suggests that the literal interpretation would be such as to insulate unknown and unidentifiable people from any nature of liability to the Sawyers by the simple expedient of their later becoming a "successor" to the Bank. As applied to the phrase "employees," however, the clause is susceptible of only one interpretation. As appellant correctly points out, the word "inure" connotes the use of a right by one party which was granted another. The release in this case was a release of the Bank, and the benefits therefrom intended to "inure" to its employees can only be benefits related to their employment by the Bank. In other words, had the Sawyers a claim of some sort against Klugherz or McIntosh, unrelated to their employment by the Bank, that claim would not be embraced by the release. That, however, is not the case here. The employees are joined in Sawyer II by virtue of their employment for the Bank, and because of actions taken in the course of that employment. The conspiratorial acts of which the Bank is accused were, of course, carried out on its behalf by its employees. The only logical interpretation of the release is that the parties intended not only to release the Bank, but to insulate its employees against claims relating to the same transaction. Those are the claims herein made, and hence we conclude that the employees are protected by the release from this suit.

Appellant contends, however, that the ruling in favor of Klugherz and McIntosh was error because the matter was not properly before Judge Orfield. Just the day prior to Judge Orfield's ruling Judge Woodworth had denied the same motion, and no compliance with Code of Civil Procedure section 1008 (requiring application to the original judge for reconsideration of a motion) had been made. Further, appellant contends that Klugherz and McIntosh never in fact moved for judgment before Judge Orfield on the ground of the release; that their motion before Judge Orfield was solely on the res judicata theory; and that the ultimate ruling by Judge Orfield on *both* res judicata and the release grounds came as a surprise.

It is noted, however, that the Klugherz and McIntosh motions for summary judgment on the ground of the release were thoroughly prepared and argued before Judge Woodworth. While an order denying a motion for summary judgment is ordinarily nonappealable, like any other intermediate ruling before judgment it is reviewable on appeal from a final judgment. (4 Witkin, Cal. Procedure (2d ed. 1971) Proceedings Without Trial, § 195, p. 2842.) That final judgment has been rendered and all issues in the case are now on appeal. While the precise question on appeal from Judge Woodworth's *denial* of the Klugherz and McIntosh motions may not have been framed in counsel's briefs, the matter is nonetheless before us, the record is complete, and has been fully argued. Thus, whether the alleged error of Judge Orfield in hearing the matter on the ground of the release be deemed harmless;[1] or whether the posture of the issue be cast in terms of reversing Judge Woodworth's denial of the motion, the proper appellate remedy is to sustain the present status of the case, which is that the defendants Klugherz and McIntosh should be dismissed.

### Rulings on Discovery Matters

Appellant seeks review of the denial by the lower court of its motion to compel additional answers to certain written interrogatories and questions posed at depositions. The general trend of the questions was to elicit from the deponent his or its reasons for taking action (as, for instance, why Financial did not take record title to the realty before transfer to Lexington). The objections to these questions were based

---

[1]The failure to comply with Code of Civil Procedure section 1008 is in any event not a jurisdictional matter. (See *Lopez v. Larson* (1979) 91 Cal.App.3d 383 [153 Cal.Rptr. 912]; *Josephson v. Superior Court* (1963) 219 Cal.App.2d 354 [33 Cal.Rptr. 196].)

upon the attorney-client privilege, it being asserted that the "reason" for taking some action was that counsel had so advised, or that certain action was taken to "implement the advice of counsel."

It is well settled that facts involved in a lawsuit are not insulated from discovery simply because they have been communicated to counsel. (See *Brown v. Superior Court* (1963) 218 Cal.App.2d 430.) However, the trial court has broad discretion in ruling on motions to compel discovery. (*Pacific Tel. & Tel. Co. v. Superior Court* (1970) 2 Cal.3d 161, 171 [84 Cal.Rptr. 718, 465 P.2d 854]; *Crumpton v. Dickstein* (1978) 82 Cal.App.3d 166, 169 [146 Cal.Rptr. 840].) This exercise of discretion will not be reversed on appeal unless it has been manifestly abused and where the facts justifying discovery are clear. (See *People* ex rel. *Dept. of Transportation v. Superior Court* (1976) 60 Cal.App.3d 352, 357 [131 Cal.Rptr. 476].) Particularly in cases involving the invocation of the attorney-client privilege and its oft related attorney work product privilege, it would seem that the conclusions reached by the trial judge, who must administer the day-to-day course of trial discovery, should be accorded deference unless clearly erroneous. (See *American Mut. Liab. Ins. Co. v. Superior Court* (1974) 38 Cal.App.3d 579, 593 [113 Cal.Rptr. 561].) When and to what extent an answer about a client's motivation for taking some course of action will unreasonably impinge upon the attorney-client privilege, or will constitute impermissible invasion of the attorney's work product, is a difficult matter to resolve, depending usually upon the facts and background of the particular case. We are unable in this case to conclude that the trial court abused its discretion in refusing to require requested discovery.

## Conclusion

The dismissal of Toronto Dominion Bank of California, Charles Klugherz and William McIntosh is affirmed. The judgment dismissing all of the other parties defendant is reversed. The discovery orders are affirmed. Toronto Dominion Bank of California, Charles Klugherz and William McIntosh to recover costs on appeal. Appellants (Edmund V. Sawyer et al.) to recover their costs on appeal from the remaining defendants.

Staniforth, Acting P. J., concurred.

**WIENER, J.**—Concurring. I start with the obvious. This is not a simple case. One senses, however, that the energies of highly talented counsel

may not have been channeled towards simplifying the issues in order to expeditiously resolve this controversy. Nevertheless, it is probably fair to say this dispute with exceptionally competent and diligent lawyers has been handled in the same way as are other commercial cases involving large sums of money. The ritual of litigation seems to take on new ceremonies with each advance in the electronics industry. The word processor, spewing out pages of interrogatories, requests for admissions and motions, spawns gobs of materials for copying machines, the product of which ultimately descends upon the court. Here, for example, before a full trial, the record stands 22 3/4 inches high, weighing in at an even 50 pounds. One queries what the height and weight will be after the main event when we undoubtedly will have another chance to search for error. On occasion, one questions whether the paper mill improves the quality of justice and ponders the effect if all of us, including judges, were deprived of technology and required to write by quill pen.

These musings, perhaps technically unnecessary to my concurrence, are helpful to describe the setting in which this court is called upon to deny plaintiffs a full trial because of res judicata, a doctrine tied to the concept of judicial economy. But the lawyer-created environment here is important to accurately analyze the issue of estoppel. As I will explain, I conclude defendants, except for the Toronto Dominion Bank and its officers, are estopped from raising the defense of res judicata. Accordingly, I agree with the result reached by the majority.

A defendant in a second action may be precluded from asserting res judicata as a defense because of his conduct in prior proceedings. (See 4 Witkin (2d ed. 1971) Cal. Procedure, § 152, p. 3298, (1981 supp.) p. 248.) At an earlier time this court explained, "Our courts have in appropriate situations weighed the motions and objections of counsel in a former action to determine whether a contradictory stand was later assumed, and the general principle has been applied that one cannot take inconsistent positions to the injury of an opponent. Thus, where a party litigant successfully blocked the attempt of its opponents in an earlier case to amend their pleading and consolidate with another pending action to include certain issues, and later contended that such issues were res judicata because they might have been ajudicated in the earlier case, the Supreme Court in *United Bank & Trust Co.* v. *Hunt*, 1 Cal.2d 340, 345 ..., held that 'Litigants can not successfully assume such inconsistent positions' and treated the situation developed in the first trial as '... tantamount to an express determination on the part of the court with the consent of opposing counsel to reserve the issues involved for

future ajudication.'" (*Lunsford* v. *Kosanke* (1956) 140 Cal.App.2d 623, 628-629 [295 P.2d 432].) Whether this principle should be applied will turn on the facts of each case for uncertainty as to the finality of a judgment should not as a general rule be induced into our judicial system "by occasional apparent inequities." (See *Slater* v. *Blackwood* (1975) 15 Cal.3d 791, 798 [126 Cal.Rptr. 225, 543 P.2d 593].) Obviously, one must move cautiously. "Judicious utilization of judicial and litigant resources become ever more essential in the wake of the law explosion. The efficient administration of justice would not be advanced by a rule resulting in or encouraging multiple litigation of a single cause of action." (*Mattson* v. *City of Costa Mesa* (1980) 106 Cal.App.3d 441, 455 [164 Cal.Rptr. 913].) I examine the record with these principles in mind.

Plaintiffs filed their first case (No. 369573) in July 1975; their second (No. 409803) on January 11, 1978. On January 13, 1978, plaintiffs moved to consolidate both cases because some of the parties and certain of the issues were the same. Unable to serve all defendants, plaintiffs' motion to consolidate was reset beyond February 15, 1978, the trial date in case No. 369573. Pending hearing on that motion, plaintiffs moved to continue the trial to allow the court to consider the motion for consolidation. Counsel for First City defendants in Sawyer I, one of whom is appellate counsel here, opposed the motion for continuance by saying there was no basis for consolidation, arguing further that "[p]laintiffs are pursuing theories of action for conspiracy and fraud in Case No. 409803, whereas in the above-captioned action plaintiffs are pursuing theories for breach of contract, declaratory relief and judicial foreclosure. *The issues raised in the two cases are necessarily and substantially different.*" (Italics supplied.)

At first blush it appears *United Bank & Trust Co.* v. *Hunt, supra,* 1 Cal.2d 340 [34 P.2d 1001], controls. Defendants respond to this superficial similarity, however, by explaining they were deliberate in their use of language in opposing the motion. They referred to different *theories of action*, not *causes of action.*

Whether I am correct in believing that there is only a subtle difference between the phrases "theory of action" and "cause of action" is immaterial. What is important is defendants' failure to have communicated this distinction in any meaningful fashion to the trial judge who ruled on the continuance. If defendants' counsel made the tactical decision to oppose the continuance on the assumption that if successful they

would then be able to prevent litigation in the second case on the basis of res judicata, it would have been simple enough for them to tell the court that res judicata was involved. If they had done so the judge considering the motion would then have been able to evaluate all relevant factors affecting his decision before exercising discretion in making his ruling. In light of the language which defendants selected to oppose the motion for the continuance the ruling on which prevented the court from ever considering the merits of plaintiffs' request for consolidation, it was reasonable for both the court and plaintiffs' counsel to conclude defendants' opposition to the continuance would not prevent a trial of the second case in which the issues were represented to be "necessarily and substantially different." Accordingly, reasonably interpreted, defendants' actions fall within the narrow rule of *United Bank &Trust Co.* v. *Hunt, supra.* Once having represented to the court there were two different actions with different issues, they may not now stop plaintiffs from having a full trial on those "different issues."

I concur in the court's judgment as to defendants Toronto Dominion Bank of California, Charles Klugherz and William McIntosh.

A petition for a rehearing was denied October 26, 1981, and on November 6, 1981, the judgment was modified to read as printed above. The petitions of respondents First City Financial Corporation et al., Cytrynbaum, Ostrow and Belzberg for a hearing by the Supreme Court were denied December 16, 1981.