Opinion
NARES, J.
In a continuation of a controversy now entering its second decade, after an adverse decision in both the trial court and in this court on a lawsuit filed against TCW Realty Fund II Holding Company (TCW), Rancho Bernardo Village Associates et al. (RBVA), and Lyman Clark et al. (the Clarks), Lorraine Weikel, individually and as executor for Maurice Weikel, deceased (hereafter, Weikel) subsequently refiled suit against all of the original defendants. Weikel now appeals following the sustaining of demurrers by respondents TCW, RBVA and the Clarks to the latest action. Weikel argues that her complaint was not barred. We affirm the judgment.
Factual and Procedural Background[1]
“A. The Parties
“The dispute revolves around a small wedge of land (hereafter ‘the wedge’) which formed part of the boundary between two adjacent shopping centers in Rancho Bernardo. Dr. Maurice Weikel (now deceased) and his wife Lorraine owned the shopping center (the Weikel Center) on the northern side of the wedge.
“The shopping center on the southern side of the wedge is known as ‘The Plaza.’ The Plaza was developed by defendant/respondent Rancho Bernardo Village Associates (RBVA). Defendants/respondents Jay Kuhne and Ralph Braden were the general partners of RBVA. In 1984 defendant/respondent/ cross-appellant TCW Realty Fund II Holding Company (TCW) purchased The Plaza from RBVA.
“At the northern end of The Plaza, adjacent to the wedge, is a retail shop occupied by defendant/respondent Lyman Clark. This lawsuit resulted from the conflict between Weikel’s desire to build on the wedge and TCW’s desire to preserve the integrity and beauty of Clark’s shop.
*1238 “B. Phase I: The Initial Dispute and the ‘RBVA Agreement’
“In 1980 RBVA began developing The Plaza immediately south of the Weikel Center. The permit to build The Plaza contained the condition that there be direct access across the common boundary between The Plaza and the Weikel Center.[2]
“In late 1981 RBVA, without Weikel’s approval, unilaterally installed various forms of access across the common boundary. It removed curbs, landscaping and sprinkler systems to open a vehicle passage in front of Clark’s shop; it opened a curb to provide access behind Clark’s shop; and at the other end of the common boundary it installed a sidewalk leading from a bank and office building to Weikel’s parking lot. After Weikel protested, RBVA barricaded vehicle access, removed the sidewalk, and agreed to restore Weikel’s improvements if an agreement on access were not reached.
“Extensive negotiations resulted in the so-called ‘RBVA agreement.’ Weikel agreed to cooperate on an access agreement if RBVA would commit to a number of endeavors, one being to convey to Weikel title to The Plaza’s portion of the wedge.[3]
“Weikel wanted to build on the wedge, and to that end requested that RBVA convey a fee interest. However, RBVA’s lender would not agree to release any land from its security. To avoid that problem, Weikel’s attorney suggested Weikel accept an alternative solution: RBVA would grant Weikel an encroachment or building easement over The Plaza’s side of the wedge to allow Weikel to build on the wedge. RBVA’s lender agreed to subordinate to this easement. The RBVA agreement, by which the parties granted each other ‘access easements’ and RBVA granted Weikel his ‘building easement,’ was finalized and documented by March 1984.
“Meanwhile, RBVA was negotiating to sell the property to TCW. TCW conditioned its purchase on resolution of the dispute between RBVA and Weikel and the removal of the parking lot barriers. The RBVA agreement accomplished that goal. The 1984 access easements specifically provided mutual ingress and egress so that traffic could move freely between the two *1239 centers. The building easement and access easements were recorded in April 1984, and TCW’s acquisition of The Plaza closed in June 1984.
“C. Phase II: The ‘Lot Split Agreement’
“Weikel soon learned the building easement would not work. The City would not approve construction which straddled a lot boundary. Weikel approached TCW in May 1985 to determine if TCW would agree to a lot line adjustment enabling him to build on the wedge.
“From the earliest meetings TCW expressed concerns over the impact a lot line adjustment might have on Clark’s shop. At the initial May 1985 meeting, concerns about cutting off Clark’s windows were raised, with TCW indicating it was willing to cooperate but was concerned about an agreement which might engender a lawsuit should the lot line adjustment restrict Clark’s sight or cut into his roof canopy.
“Preserving Clark’s roof line, sight lines and windows was a continuing concern expressed by TCW on numerous occasions. Typical of TCW’s statements was the following taken from a November 1985 letter in which TCW’s agent responded to Weikel’s proposal to build up to and tie into Clark’s building: ‘ “As I have indicated to you, we have some real concerns as to how these additional stores will affect our property, especially since they deal with the tearing down and altering of our roof line .... Our concern also relates to how the structure you plan to construct will affect [Clark’s store] and the exposure that it now enjoys. I do believe that this particular tenant would feel strongly about losing any part of the store front or exposure to any of his windows on the side or to the front of his store.” ’
“Similar concerns over the impact Weikel’s buildings might have on Clark’s sight lines and ‘canopy’ were expressed in meetings and correspondence in the succeeding years. Weikel’s representative, Mr. Cooper, met with Clark directly to discuss Clark’s concerns. Clark indicated he would fight any impingement of his sight lines or canopy, and Cooper assured him there would be no loss of windows or sight lines, and no loss of, or building under, the canopy.
“During the lengthy negotiations, TCW asked to see specific plans to determine how Weikel’s building might affect Clark, but Weikel understandably was reluctant to invest in detailed plans until it appeared the deal might materialize. However, Cooper continually reassured TCW that the worst possible impact on Clark would be the addition of sprinklers to the roof canopy or conversion of part of the canopy to an open trellis.
*1240 “By the fall of 1987 relations between Weikel and TCW had become rancorous.[4] However, TCW continued to negotiate, and also continued its efforts to obtain Weikel’s plans to determine any impact it might have on Clark. One of the plat maps Weikel’s agent provided to Ms. Mathews (TCW’s representative) clearly showed the proposed new boundary line going around Clark’s canopy, with the architect’s notation to keep any new building 10 feet from the canopy face.[5]
“TCW and Weikel eventually reached an agreement (the Tot split agreement’) in which TCW would convey certain land to Weikel, and the parties would substitute new access easements for the 1984 access easements, which contained the erroneous property description. The key provisions of the agreement related to Clark’s shop. TCW’s obligations under the agreement were subject to the condition that Weikel would use best efforts in his construction to preserve the canopies, but that if local regulations required the canopies be modified, Weikel would submit plans for such modification to TCW for its approval. Also, paragraph 2.c. of the contract provided: ‘ “The occurrence of the lot split shall not cause the Original TCW Land to be in violation of any San Diego municipal law, regulation or ordinance (including, but not limited to, minimum setback requirements) ....”’
“Although TCW’s counsel prepared the text of the agreement, Weikel’s agent was responsible for supplying the other exhibits, including the plat map and the property descriptions attached to the deeds. The agreement was signed by the principals without these key exhibits attached.
“The plat map supplied by Cooper and actually attached to the agreement and conveyance documents had the new boundary line running alongside Clark’s building and under the canopy, rather than with a 10-foot setback skirting the canopy. This new lot line had the effect of immediately placing Clark’s building in violation of several requirements: the canopy now violated the setback requirements of zoning regulations; and the proximity of the wall to the new property line mandated that existing display windows be replaced with fire-rated windows.
*1241 “D. The Dispute
“Weikel proceeded with his plans to develop the property. He submitted plans to TCW which effectively eliminated any sight lines to the northern side of Clark’s shop, the proposed plans enveloping the entire wedge, abutting and burying the northern face of Clark’s shop and jutting out to obscure Clark’s sight lines.
“However, the building department would not approve Weikel’s plans because the lot line relocation caused Clark’s shop to be in violation of both the building code (fire-rated windows or openings were within five feet of a property line, and fire-rated walls were within twenty feet of the property line), and the zoning code (specifically, the provision prohibiting any structure, such as the canopy, from overhanging a property line). Weikel proposed three alternatives to solve the concerns of the building department, none of which was acceptable or accorded with the intent to preserve the beauty and visibility of Clark’s shop.[6]
“TCW consulted with its property managers and Clark concerning the various proposals. The property managers indicated all three proposals would have a negative impact on both Clark and the future leasability of Clark’s space. Clark advised TCW none of the proposals was acceptable and would have such a negative impact on his business that he would file a lawsuit if any of those proposals was implemented. TCW also consulted with the architect who originally designed The Plaza. The architect, after consulting with the building department, advised that these options also required construction of a parapet above Clark’s shop. The architect opined that all of the available options would negatively affect Clark’s retailing operation by reducing sight lines and the architectural integrity and appeal of the building, and would be costly.
“TCW advised Weikel that none of the proposed plans was feasible and offered to meet with him to discuss alternatives. This [initial] lawsuit followed.
*1242 “E. The [First] Lawsuit and Trial Court Decision
“Weikel sued on various theories. The first count alleged breach of the RBVA agreement, claiming the refusal to modify Clark’s shop to accommodate Weikel’s building plans breached the implied covenant of good faith and fair dealing. The second count claimed the lot split agreement was similarly breached. The third count alleged fraud, claiming TCW never intended to meet its promise to approve development by Weikel. Count four sought a declaration that Weikel had the right to rescind the 1988 access easements. Count six alleged Weikel had a right to an injunction against unreasonable surface water discharges onto Weikel’s property. Count seven sought an injunction requiring TCW and Clark to modify the shop because of building code violations. Finally, Weikel’s common count sought restitution of the value RBVA and TCW had received from the access easement Weikel had granted.
“TCW cross-complained and alleged Weikel made false representations that he would preserve Clark’s building and that the lot split did not violate any laws, giving rise to claims for fraud, negligent misrepresentation and breach of contract. TCW also alleged the lot split, by causing Clark’s shop to violate code requirements, was the failure of a condition to the deed and entitled TCW to rescind. TCW also sought declaratory relief validating the 1988 access easements.
“The court entered judgment in favor of TCW and against Weikel.[7] The essential basis for the judgment was the determination that the lot split was rescindable because it placed Clark’s shop in violation of code requirements, contrary to the parties’ intent. The rescission rendered moot Weikel’s claims insofar as they were premised on the lot split agreement. The court also concluded TCW was entitled to a declaration that the original easements be reinstated without granting any right to Weikel to block access or rescind them. Weikel appeals all of these rulings.”
In our opinion on the appeal, we affirmed the great bulk of the trial court’s rulings, deleting only that language purporting to preclude Weikel from unilaterally rescinding the reinstated easements. (Weikel v. Clark, supra, No. D015050.)
Our opinion in the prior case (hereinafter Weikel I) was filed on September 8, 1993. Slightly over one month later, when that opinion became final as to *1243 this court, Weikel filed another lawsuit against TCW, RBVA and the Clarks, which will hereinafter be referred to as Weikel II.[8]
In Weikel II, Weikel sought to (1) quiet title to interests conveyed by the 1984 “building easement”; (2) recover damages from TCW and the Clarks for a trespass “[c]ommencing June 19, 1984, and continuing to this day”; (3) abate a nuisance (the Clarks’ building) which “[c]ommenc[ed] May 29, 1985”; (4) recover damages from RBVA for an alleged breach of warranty “[cjommencing April 18, 1984”; (5) recover damages from RBVA for breach of an implied covenant “[c]ommencing April 18, 1984”; (6) obtain from the court various declarations of right against TCW, RBVA and the Clarks; (7) obtain restitution from RBVA and TCW for use of the easement; and (8) obtain another quiet title.
TCW thereafter demurred on the grounds (1) all of Weikel’s claims were barred by res judicata, (2) all of Weikel’s claims were barred by statutes of limitations, and (3) in any event, Weikel’s claims failed to state a cause of action. The Clarks moved for judgment on the pleadings on the same grounds.
On February 4, 1994, the court sustained TCW’s demurrer without leave to amend and granted the Clarks’ motion for judgment on the pleadings, holding “[t]he action is barred by the doctrine of res judicata. Issues regarding the validity and scope of the 1984 easement should have been raised in the prior action. The two sets of easements were ‘component parts of an overall agreement’ which should have been, and to the extent necessary were adjudicated in the same action.” (Italics added.) Judgment of dismissal was later entered as to TCW and the Clarks.
On April 22,1994, RBVA’s default was set aside and the RBVA demurrer to the complaint was sustained without leave to amend, and judgment of dismissal in favor of RBVA was thereafter entered on June 20, 1994. Weikel appealed from the rulings in favor of TCW, the Clarks and RBVA. Consistent with his previous practice, Weikel’s counsel filed a separate notice of appeal from the orders made concerning attorney [9]
Standard of Review
“On appeal from a judgment dismissing an action after sustaining a demurrer without leave to amend, the standard of review is well settled. The *1244 reviewing court gives the complaint a reasonable interpretation, and treats the demurrer as admitting all material facts properly pleaded. (Blank v. Kirwan (1985) 39 Cal.3d 311, 318 [216 Cal.Rptr. 718, 703 P.2d 58]; Buckaloo v. Johnson (1975) 14 Cal.3d 815, 828 [122 Cal.Rptr. 745, 537 P.2d 865].) The court does not, however, assume the truth of contentions, deductions or conclusions of law. (Moore v. Regents of University of California (1990) 51 Cal.3d 120, 125 [271 Cal.Rptr. 146, 793 P.2d 479, 16 A.L.R.5th 903].) The judgment must be affirmed ‘if any one of the several grounds of demurrer is well taken. [Citations.]’ (Longshore v. County of Ventura (1979) 25 Cal.3d 14, 21 [157 Cal.Rptr. 706, 598 P.2d 866].) However, it is error for a trial court to sustain a demurrer when the plaintiff has stated a cause of action under any possible legal theory. (Barquis v. Merchants Collection Assn. (1972) 7 Cal.3d 94, 103 [101 Cal.Rptr. 745, 496 P.2d 817].) And it is an abuse of discretion to sustain a demurrer without leave to amend if the plaintiff shows there is a reasonable possibility any defect identified by the defendant can be cured by amendment. (Blank v. Kirwan, supra, 39 Cal,3d at p. 318.)” (Aubrey v. Tri-City Hospital Dist. (1992) 2 Cal.4th 962, 966-967 [9 Cal.Rptr.2d 92, 831 P.2d 317].)
In this case, as noted earlier, the trial court sustained the demurrer of TCW[10] on the grounds res judicata applied to the claims sought to be presented in Weikel II, and thus did not rule on whether the other grounds supporting the demurrer (statutes of limitations and failure to state a cause of action) were “well taken.” We proceed to a discussion of the question.
Discussion
In 1984 counsel for Weikel made a decision: to devise a complex agreement for a purpose (construction on Weikel’s part of the wedge of a building across lot lines) which could not (as it turns out) be accomplished. In the many years since, counsel for Weikel has litigated the consequences of his decision.[11] All things, however, must end, and that principle applies here with particular force. While Weikel now mounts an extended discourse against the rulings below, the assertions are without merit.[12]
*1245 A. Res Judicata
The general principles here applicable are clear: “Res judicata operates as a bar to maintaining a second suit between the same parties or parties in privity with them on the same cause of action. (Branson v. Sun-Diamond Growers (1994) 24 Cal.App.4th 327, 340 [29 Cal.Rptr.2d 314]; Gamble v. General Foods Corp. (1991) 229 Cal.App.3d 893, 898 [280 Cal.Rptr. 457].) However, where a judgment is not rendered on the merits, it does not operate as a bar. (Koch v. Rodlin Enterprises (1990) 223 Cal.App.3d 1591,1596 [273 Cal.Rptr. 438].) Res judicata precludes piecemeal litigation by splitting a single cause of action or relitigation of the same cause of action on a different legal theory or for different relief. (Boccardo v. Safeway Stores, Inc. (1982) 134 Cal.App.3d 1037, 1043 [184 Cal.Rptr. 903].)” (Lucas v. County of Los Angeles (1996) 47 Cal.App.4th 277, 285 [54 Cal.Rptr.2d 655].)
Here the central question is whether Weikel II was, or was not, an attempt at “relitigation of the same cause of action on a different legal theory.” For purposes of this analysis, it is of no moment whether the identical causes of action were in fact litigated in Weikel I; all that is required is that Weikel have had the opportunity to litigate them in Weikel I. ’’The doctrine of res judicata gives conclusive effect to a final judgment rendered upon the merits by a court having jurisdiction of the cause. (Goddard v. Security Title Ins. & Guar. (1939) 14 Cal.2d 47, 51 [92 P.2d 804].) ‘The rule is based upon the sound public policy of limiting litigation by preventing a party who has had one fair trial on an issue from again drawing it into controversy.’ (Bernhard v. Bank of America (1942) 19 Cal.2d 807, 811 [122 P.2d 892].) ‘Restatement Second of Judgments views the doctrine as a bar or merger applicable to subsequent litigation between the same parties concerning the same controversy with very few exceptions. The Restatement’s approach is based on the assumption that there has been an opportunity in the first litigation for a fair and full hearing of the claim asserted. Once that opportunity has been afforded, the Restatement Second asserts, fairness dictates that the controversy in question be put to rest.’ (Italics added.) (Nakash v. Superior Court (1987) 196 Cal.App.3d 59, 68 [241 Cal.Rptr. 578].)” (Schultz v. Harney (1994) 27 Cal.App.4th 1611, 1619-1620 [33 Cal.Rptr.2d 276].)[13]
The relevant question reduces to a determination whether the causes of action resolved in Weikel I, and those matters as to which Weikel *1246 then had an opportunity to litigate, embrace the claims sought to be asserted in Weikel II. This in turn requires a determination as to the “primary rights” sought to be asserted.
“For purposes of identifying a cause of action under the doctrine of res judicata, ‘California has consistently applied the “primary rights” theory, under which the invasion of one primary right gives rise to a single cause of action.’ {Slater v. Blackwood (1975) 15 Cal.3d 791, 795 [126 Cal.Rptr. 225, 543 P.2d 593].) But ‘. . . the “cause of action” is based upon the harm suffered, as opposed to the particular theory asserted by the litigant. [Citation.] Even where there are multiple legal theories upon which recovery might be predicated, one injury gives rise to only one claim for relief.’ {Ibid.)
“Under the primary rights theory advanced by Pomeroy, ‘. . . a cause of action consists of 1) a primary right possessed by the plaintiff, 2) a corresponding primary duty devolving upon the defendant, and 3) a delict or wrong done by the defendant which consists in a breach of such primary right and duty. [Citation.] Thus, two actions constitute a single cause of action if they both affect the same primary right.’ (Gamble v. General Foods Corp. (1991) 229 Cal.App.3d 893, 898 [280 Cal.Rptr. 457].)” (Branson v. Sun-Diamond Growers, supra, 24 Cal.App.4th at pp. 340-341, fn. omitted.)
In Bay Cities Paving & Grading, Inc. v. Lawyers’ Mutual Ins. Co. (1993) 5 Cal.4th 854, 860 [21 Cal.Rptr.2d 691, 855 P.2d 1263], the Supreme Court considered the question whether a lawyer’s two acts, of failing to file a stop notice and also failing to foreclose upon a previously recorded mechanic’s lien, constituted one, or two, causes of action. The court held:
“Bay Cities had a single injury and thus a single cause of action against its attorney. ‘California has consistently applied the “primary rights” theory, under which the invasion of one primary right gives rise to a single cause of action.’ (Slater v. Blackwood[ (1975)] 15 Cal.3d 791, 795 [126 Cal.Rptr. 225, 543 P.2d 593]; Big Boy Drilling Corp. v. Rankin (1931) 213 Cal. 646, 649 [3 P.2d 13]; 4 Witkin, Cal. Procedure (3d ed. 1985) Pleading, § 23, pp. 66-67.) Bay Cities had one primary right—the right to be free of negligence by its attorney in connection with the particular debt collection for which he was retained. He allegedly breached that right in two ways, but it nevertheless remained a single right.
“Similarly, ‘[T]he “cause of action” is based upon the harm suffered, as opposed to the particular theory asserted by the litigant. . . . Even where there are multiple legal theories upon which recovery might be predicated, *1247 one injury gives rise to only one claim for relief.’ (Slater v. Blackwood, supra, 15 Cal.3d 791, 795, italics added.) Bay Cities suffered a single injury as a result of its attorney’s omissions—the inability to collect the amount owed to Bay Cities for its work on the construction project.
“. . . *. . . The “cause of action” is to be distinguished from the “remedy” and the “relief’ sought, for a plaintiff may frequently be entitled to several species of remedy for the enforcement of a single right.’ (Big Boy Drilling Corp. v. Rankin, supra, 213 Cal. 646, 649 [citations omitted].)”[14] (Fn. omitted.)
With these principles in mind, we review the substance of the complaints in both Weikel I and Weikel II.
B. The Complaints Compared
In our previous opinion, we described the pleadings in the first lawsuit (Weikel I) as follows: “The first count alleged breach of the RBVA agreement, claiming the refusal to modify Clark’s shop to accommodate Weikel’s building plans breached the implied covenant of good faith and fair dealing. The second count claimed the lot split agreement was similarly breached. The third count alleged fraud, claiming TCW never intended to meet its promise to approve development by Weikel. Count four sought a declaration that Weikel had the right to rescind the 1988 access easements. Count six alleged Weikel had a right to an injunction against unreasonable surface water discharges onto Weikel’s property. Count seven sought an injunction requiring TCW and Clark to modify the shop because of building code violations. Finally, Weikel’s common count sought restitution of the value RBVA and TCW had received from the access easement Weikel had granted.” (Weikel I, supra, No. D015050.)
Earlier, we described the Weikel II pleadings: In Weikel II, Weikel sought to (1) quiet title to interests conveyed by the 1984 “building easement”; (2) recover damages from TCW and the Clarks for a trespass “[c]ommencing June 19, 1984, and continuing to this day”; (3) abate a nuisance (the Clarks’ building) which “[c]ommenc[ed] May 29, 1985”; (4) recover damages from RBVA for an alleged breach of warranty “[c]ommencing April 18, 1984”; (5) recover damages from RBVA for breach of an implied covenant “[c]ommencing April 18, 1984”; (6) obtain from the court various declarations of right against TCW, RBVA and the Clarks; (7) obtain restitution from RBVA and TCW for use of the easement; and (8) obtain another quiet title. (Ante, at p. 1243.)
*1248 The substantial identity of these complaints is clear. The Weikel I “breach of covenant” and “fraud” counts are essentially repeated in Weikel II as “breach of warranty” and another “breach of covenant.” The injunctive relief sought in Weikel I as to the structure in which the Clarks’ store is located is identical to the claim asserted in Weikel II to “abate a nuisance,” and in both pleadings “restitution” for use of the easement is sought.[15]
The single point thus remaining for decision is whether any other matter set out in Weikel II involves both (a) a different “primary right” than set out in Weikel I and also (b) one which could not have been litigated therein. It appears not.
C. Analysis
Viewed under any light, the “primary right” herein must be seen as Weikel’s interest in constructing a building on a portion of the “wedge.” The “corresponding primary duty” owed Weikel by TCW is no more than the duty not to unreasonably interfere with Weikel’s rights, but that “duty” cannot be transmuted into an obligation to tear down the structure of an existing tenant of TCW, the Clarks, for the sole benefit of Weikel. Essentially, the refusal of TCW to damage its own tenant, the Clarks, for the benefit of Weikel, is the “breach of . . . primary right” which is now in Weikel II, just as it was earlier in Weikel I, asserted by Weikel as a basis for judicial action. This does not suffice.
Weikel’s central theory is that when Weikel I was filed in 1989, the 1984 access easements were nullities, and thus no cause of action with respect to those instruments had “accrued.” We do not agree with this assertion.
In the opposition counsel filed below to TCW’s demurrer, it was admitted that while Weikel I “focused on the rights arising from the lot split agreement and the deed delivered pursuant to it,” the case “also involved implied rights arising from the 1984 contract [while] any rights arising from the 1984 deeds were excluded.” (Italics omitted.)
This does not suffice to save the present allegations from an assertion.of the bar of res judicata. While counsel may have had a variety of reasons for having chosen to limit the scope of Weikel I, it is clear that the “rights arising *1249 from” all of the 1984 instruments could have been litigated therein. No more than this, as we have noted above, is required to bring into effect the bar of res judicata asserted below.[16]
As we observed in the last appeal, “[tjhis lawsuit resulted from the conflict between Weikel’s desire to build on the wedge and TCW’s desire to preserve the integrity and beauty of Clark’s shop.” (Weikel I, supra, No. D015050.) Nothing whatsoever in the pleadings in Weikel II, or in any of the arguments advanced either below or in this court by counsel for Weikel, dispels the entailed conclusion that the “conflict” has not, since the time of the last appeal, become anything substantially different from what it once was.
All that has happened is that the focus of the pleadings in Weikel II has been changed from the (now-rescinded) “lot line adjustment” which was at issue in Weikel I to the underlying earlier “access easements,” also at issue in the earlier action. The true interest of Weikel, the ability to construct a building on a portion of the “wedge,” remains unchanged, as does the existence of the impediment to Weikel’s desires, the unaltered structure housing the retail store operated by the Clarks.
Clearly, this claim must fail. Whatever the hypothetical merits of some theory considered in the abstract,[17] as applied to the particular matter before us, nothing whatsoever asserted as a basis for recovery in Weikel II involves matters which were not, or could not have been, litigated in Weikel I.
As our Supreme Court has observed, “The primary right theory has a fairly narrow field of application. It is invoked most often when a plaintiff attempts to divide a primary right and enforce it in two suits. The theory prevents this result by either of two means: (1) if the first suit is still pending when the second is filed, the defendant in the second suit may plead that fact in abatement (Code Civ. Proc., § 430.10, subd. (c); Wulfjen v. Dolton [(1944)] 24 Cal.2d 891, 894-895 [151 P.2d 846]); or (2) if the first suit has terminated in a judgment on the merits adverse to the plaintiff, the defendant in the second suit may set up that judgment as a bar under the principles of res judicata (Panos v. Great Western Packing Co. (1943) 21 Cal.2d 636, 638-640 [134 P.2d 242]). The latter application of the primary right theory appears to be most common: numerous cases hold that when there is only one *1250 primary right an adverse judgment in the first suit is a bar even though the second suit is based on a dijferent theory (e.g., Johnson v. American Airlines, Inc. (1984) 157 Cal.App.3d 427, 432 [203 Cal.Rptr. 638]) or seeks a dijferent remedy (e.g., Stafford v. Yerge (1954) 129 Cal.App.2d 165, 171 [276 P.2d 649]).” (Crowley v. Katleman (1994) 8 Cal.4th 666, 682 [34 Cal.Rptr.2d 386, 881 P.2d 1083], italics added.)
This case is a clear instance of a single “primary right” which is sought to be asserted, after an adverse judgment in a first lawsuit, in a second proceeding, albeit somewhat “based on a different theory ... or seeking] a different remedy . . . .” Under the cases set out above,[18] an attempted reassertion of the same “primary right” is properly subject to the bar of res judicata, as the trial court held herein. For these reasons, we must affirm the judgment.[19]
Finally, we must observe that apart from the lack of merit in Weikel’s suit, from every viewpoint, public policy demands the termination of this litigation. RBVA, for example, has not held any interest in the property since 1984. Surely it may be entitled to have this matter resolved in this century, just as the Clarks (essentially innocent bystanders in this collision of interests between property owners) are entitled to operate their business without either the threats of demolition or the need for more lawyers hanging over their heads, as has been true for over a decade now. “The rule against splitting a cause of action is based upon two reasons: (1) That the defendant should be protected against vexatious litigation; and (2) that it is against *1251 public policy to permit litigants to consume the time of the courts by relitigating matters already judicially determined, or by asserting claims which properly should have been settled in some prior action.'’'’ (Wulfjen v. Dolton (1944) 24 Cal.2d 891, 894-895 [151 P.2d 846], italics added.) That holding applies to this case.
When all of this is considered in connection with the fact that the “wedge” at its widest part is only 11 yards wide, it is not reasonable to believe that the additional revenues (over and above those from the existing structure) from any structure Weikel might have erected thereon could have equalled the great amounts which have thus far been expended by Weikel in the course of litigation. (See, e.g., fn. 11, ante.) Our judicial system is intended for the resolution of disputes, rather than their perpetuation through the ages. In the circumstances before us, it would be against public policy to permit this litigation to continue, and we will not do so.
Disposition
The judgment is affirmed. Respondents TCW, RBVA and the Clarks to recover costs on appeal.
Kremer, P. J., and Haller, J., concurred.
*1252 Appendix A
[[Image here]]
*1253 [[Image here]]
*1254 [[Image here]]
*1255 [[Image here]]
*1256 [[Image here]]
*1257 [[Image here]]
*1258 [[Image here]]
*1259 [[Image here]]
*1260 [[Image here]]
*1261 [[Image here]]
*1262 [[Image here]]
*1263 [[Image here]]

As this appeal involves substantial reference to the prior proceedings, the following factual and procedural statement is taken in part from our opinion in that prior appeal, Weikel v. Clark (Sept. 8, 1993) D015050 (nonpub. opn.) (consolidated with Weikel v. Rancho Bernardo Village Associates, D015051, and Weikel v. TCW Realty Fund II Holding Co., D015055). Footnotes 2 through 7 from that opinion are included herein as originally numbered.

Easy access between the two centers would make them more desirable, because there would effectively be two anchor tenants (a Vons supermarket at the northern end, and a Savon Drugstore at the most southern end), creating customer traffic within the ‘integrated’ centers.”

RBVA also agreed to replace certain landscaping and sprinklers its crews had destroyed; to remove a sidewalk on the western perimeter; to build a sidewalk to join the buildings on the eastern perimeter; to redesign parking and traffic flow in Weikel’s parking lot; to construct certain improvements to control surface water drainage; and to drop plans for a kiosk.”

Weikel apparently discovered an error in the 1984 access easements and threatened to re-barricade the opening between the parking lots. One of the legal descriptions attached to the access easements contained the error: Instead of describing the parking area, it apparently described the area covered by the building easement.”

We digress momentarily to note that there was some evidence from which a trier of fact could have concluded TCW was in fact aware that this earlier plat (showing the boundary line skirting the canopy) was later supplanted by the plat showing the new boundary line running under the canopy. Weikel’s appellate briefs recite this evidence at length to support his claim TCW in fact knew where the new line would be located. Weikel’s brief, however, ignores a most fundamental principle of appellate review: We view the evidence and inferences in the light most favorable to the judgment.”

One option left the property line in place while completely eliminating the northerly display windows and canopy as well as part of the westerly canopy. A second option moved the property line five feet back, but still required replacing the existing display windows with fire-rated windows (such as windows with chicken mesh) and removing a large part of the canopy. The third option—the only one to preserve Clark’s canopy and display windows— was deemed not viable by Weikel because it required installation of an unsightly fire wall which would block sight lines and customer traffic flow to all adjoining shops."

The court also entered judgment in favor of the Clarks pursuant to the Clarks’ motion for nonsuit brought at the close of Weikel’s opening statement on the ground that Weikel had no private right to enjoin the alleged building code violations. The court also granted judgment on the pleadings in favor of RBVA, reasoning that the lot split agreement was a novation of the RBVA agreement and thus released RBVA from further liability.”

The 12-page complaint in Weikel II is attached hereto as Appendix A.

In Weikel /, counsel for Weikel filed three separate appeals from the judgment, and also separate appeals from orders made as to attorney fees on the appeal. In the present case (Weikel II), the Clarks also appealed from the order denying them attorney fees, but that appeal was later dismissed.

Although not separately analyzed, our review of the ruling on the TCW demurrer (as will appear) effectively disposes of the issues raised by the Clarks and RBVA also. For convenience, however, we will discuss the matter largely in terms of the TCW arguments supporting the judgment and Weikel’s countervailing arguments.

In Weikel II, counsel averred that as of October 1993 Weikel has incurred some $800,000 in “legal and other expenses” in this matter, a number which has surely grown larger by now.

As we observed on the previous appeal, “counsel for Weikel has presented us with a broad panoply of claims, apparently on the theory that one cannot predict which claims an appellate court might find meritorious. We respectfully suggest that it is better policy to *1245 highlight central and meritorious claims and to avoid the waste of everyone’s time with marginal theories. We elect not to address each and every one of these theories . . . .” (Weikel I, supra, No. D015050.)

See also Thibodeau v. Crum (1992) 4 Cal.App.4th 749, 755 [6 Cal.Rptr.2d 27]: “ *[T]he rule is that the prior judgment is res judicata on matters which were raised or could have been raised, on matters litigated or litigable.’ [Citation.]” (Original italics.)

See also the decision of this court in Stoner v. Williams (1996) 46 Cal.App.4th 986, 1003 [54 Cal.Rptr.2d 243], citing Bay Cities.

Further, as we observed in our prior opinion, the trial court in Weikel I “declined Weikel’s attempt to raise this issue during closing argument, because it recognized that a claim for an injunction under the ‘building easement’ was not raised by the [Weikel /] pleadings.” Clearly, this matter nonetheless could have been raised in Weikel I, and consequently, its assertion in Weikel II is barred. Also, the claim against TCW for “restitution” was abandoned by counsel for Weikel on the prior appeal, and may not now be reasserted.

Weikel also argues that a “change of conditions” precludes application of res judicata herein. The point is simply without the slightest merit, and we do not address it.

For example, Weikel devotes much attention to the minuscule portion of our prior opinion in which we reversed the trial court order declaring that the 1984 access easement agreements were not capable of being rescinded. That minor portion of our holding did not in any way set “at large” the other issues sought to be raised in Weikel II.

Weikel cites Brenelli Amedeo, S.P.A. v. Bakara Furniture, Inc. (1994) 29 Cal.App.4th 1828 [35 Cal.Rptr.2d 348], to support his argument that distinguishable “primary rights” are involved herein. The holding, however, was that “[i]n the first action the harm alleged was breach of contractual obligations. In the present case the harm suffered by appellant is respondents’ alleged tortious conduct which has prevented satisfaction of the judgment it won in the first action. Although appellant pleads various theories of recovery, they all address the same legal wrong—respondents’ tortious conduct preventing appellant from collecting on its judgment. Some of these theories happen to bear the same name as theories pleaded in the first case. But the primary right they embody is different and thus res judicata does not apply.” {Id. at pp. 1837-1838, fn. omitted.)
The factual distinctions between Brenelli and the present matter make it inapplicable herein. This observation also applies to our decision in Sawyer v. First City Financial Corp. (1981) 124 Cal.App.3d 390, 402 [177 Cal.Rptr. 398], also relied upon by Weikel, as that case involved both a breach of contract and a subsequent, separate tort, which we held to be severable causes of action. Neither Brenelli nor Sawyer controls the resolution of the issues herein.

This holding makes it unnecessary to discuss the alternative grounds raised by TCW of the statutes of limitation and of the failure to state a cause of action. A cursory inspection of the face of the complaint in Weikel II, however, demonstrates that under any view the entirety of the complaint is time-barred, and despite extensive discussion of various theories under which some causes are asserted to have been “tolled,” nothing in Weikel’s arguments or authorities cited therein supports a contrary view.